Michael W. Carmel (AZ Bar No. 07356)
michael@mcarmellaw.com

**Law Offices of Michael W. Carmel, LTD.**
80 E. Columbus Ave.
Phoenix, AZ 85012
Ph. (602) 264.4965
Counsel to Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>COMMUNITY HEALTHCARE OF DOUGLAS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 4:13-bk-01738-BMW |

# DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

Dated: February 20, 2013

I.   INTRODUCTION AND SUMMARY ...................................................................... 1
     A.   Overview ........................................................................................................ 1
     B.   Notice to Holders of Claims and Member Interests ..................................... 1
     C.   Summary Of Treatment Of Claims And Member Interests Under The Plan ........ 2
     D.   Voting Procedures, Ballots, and Voting Deadline ........................................ 5
     E.   Confirmation Procedures .............................................................................. 5

II.  BACKGROUND REGARDING THE DEBTOR ............................................... 7
     A.   Overview of Business Operations ................................................................. 7
     B.   Prepetition Debt ............................................................................................ 7
     C.   Events Precipitating the Chapter 11 Case ..................................................... 8

III. SIGNIFICANT EVENTS IN CHAPTER 11 CASE ........................................ 8
     A.   Continuation of Business; Automatic Stay ................................................... 8
     B.   "First Day" and Administrative Orders ......................................................... 9
     C.   The DIP Facility ............................................................................................ 9

IV.  DESCRIPTION OF THE PLAN ..................................................................... 10
     A.   Introduction ................................................................................................. 10
     B.   Summary of Claims Process, Bar Date, and Professional Fees .................. 10
     C.   Classification and Treatment of Claims and Member Interests, Generally ........ 11
     D.   Treatment of Unclassified Claims .............................................................. 11
          1.   Allowed Administrative Claims ........................................................ 11
          2.   Preserved Ordinary Course Administrative Claims ........................... 12
          3.   Priority Tax Claims ............................................................................ 12
          4.   Professional Fees ............................................................................... 12
          5.   Treatment ........................................................................................... 12
     E.   Treatment of Classified Claims and Interests ............................................. 13
          1.   Class 1 (Priority Claims) ................................................................... 14
          2.   Class 2 (Secured Tax Claims) ............................................................ 14
          3.   Class 3 (Miscellaneous Secured Claims) .......................................... 14
          4.   Class 4 (Sierra Vista Secured Claims) ............................................... 15
          5.   Class 5 (General Unsecured Claims) ................................................. 15
          6.   Class 6 (Member Interests) ................................................................ 16

V.   IMPLEMENTATION OF THE PLAN ............................................................. 16
     A.   Plan Funding ............................................................................................... 16
          1.   Effective Date Payments ................................................................... 16
          2.   Unsecured Creditor Fund ................................................................... 16
     B.   CHCDI Member Substitution Agreement ................................................... 16
          1.   Member Substitution .......................................................................... 16
          2.   Compliance with Arizona Revised Statute § 10-11253 ..................... 16
          3.   Section 1145 Exemption .................................................................... 17
     C.   Certificate of Incorporation and By-Laws .................................................. 17

ii

D.     Post-Confirmation Management ................................................................. 18

E.     Unsecured Creditor Trust ........................................................................ 21

VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................... 21

A.     Assumption and Rejection of Contracts and Leases ............................... 21

B.     Cure of Defaults .................................................................................... 22

C.     Rejection Damages Bar Date ................................................................. 22

D.     Indemnification Obligations .................................................................. 22

VII.   DESCRIPTION OF OTHER PROVISIONS OF THE PLAN ................... 23

A.     Vesting of Assets ................................................................................... 23

B.     Discharge ............................................................................................... 23

C.     Injunction .............................................................................................. 23

D.     Exculpation ............................................................................................ 24

E.     Preserved Litigation Claims and Disputed Claims Resolution .............. 24

F.     Avoidance Actions ................................................................................. 24

G.     Preservation of Insurance ...................................................................... 25

H.     Releases by Debtor ................................................................................ 25

I.     Releases by Holders of Claims and Member Interests .......................... 25

J.     Retention of Jurisdiction After the Effective Date ................................ 25

VIII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN ...................... 27

A.     Acceptance of the Plan .......................................................................... 27

B.     Feasibility of the Plan ............................................................................ 27

C.     Best Interests Test ................................................................................. 28

        1.     Explanation ................................................................................ 28

        2.     Application of the Liquidation Analysis ..................................... 29

D.     Confirmation Over the Dissent of Non-Approving Classes .................. 30

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 31

A.     Introduction ........................................................................................... 31

B.     Consequences to the Debtor .................................................................. 32

C.     Tax Consequences to the Creditors who Hold Debt Instruments ......... 32

        1.     Introduction ............................................................................... 32

        2.     Recognition and Character of Gain or Loss Generally ............... 33

        3.     Accrued Interest ........................................................................ 33

        4.     Market Discount ........................................................................ 33

        5.     Other Claimholders ................................................................... 34

        6.     3.8% Medicare Tax .................................................................... 34

D.     Information Reporting and Backup Withholding .................................... 34

E.     Importance of Obtaining Professional Tax Assistance ........................... 35

X.     RISK FACTORS ............................................................................................. 35

A.     Generally ............................................................................................... 35

B.     Dependence on Key Personnel .............................................................. 35

PHOENIX/641542.3

Case 4:13-bk-01738-BMW   Doc 30   Filed 02/20/13   Entered 02/20/13 11:56:26   Desc
Main Document   Page 3 of 43

C.     Claim Amount Estimates ................................................................. 36
D.     Reorganization Factors .................................................................. 36
     1.    Financial Considerations............................................. 36
     2.    Risk of Non-Confirmation of the Plan....................... 37

XI.     ALTERNATIVES TO THE PLAN ............................................................ 37
A.     Continuation of the Chapter 11 Cases ......................................... 37
B.     Alternative Plans of Reorganization ............................................ 37
C.     Liquidation Under Chapter 7 ....................................................... 37

XII.     CONCLUSION......................................................................................... 38
A.     Hearing on and Objections to Confirmation................................ 38
     1.    Confirmation Hearing ................................................. 38
     2.    Deadline for Objections to Confirmation .................. 38
B.     Recommendation ........................................................................... 39

**APPENDICES TO DISCLOSURE STATEMENT**

Appendix 1 – Plan of Reorganization

Appendix 2 – Order Approving Disclosure Statement

PHOENIX/641542.3

# I.    INTRODUCTION AND SUMMARY

## A.    Overview

Community Healthcare of Douglas, Inc., a 501(c)(3) non-profit corporation (the "**Debtor**") filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**") on February 8, 2013 (the "**Petition Date**").

The Bankruptcy Court has approved this disclosure statement (the "**Disclosure Statement**") under Bankruptcy Code § 1125 in connection with confirmation of the Plan of Reorganization (the "**Plan**") proposed by the Debtor in this Chapter 11 case (the "**Chapter 11 Case**"). The Plan was filed with the Bankruptcy Court on February 8, 2013.

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan. A copy of the Plan, separately filed in the Chapter 11 Case, is **Appendix 1** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Case, and the anticipated reorganization of the Debtor. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. Certain provisions of the Plan, and thus the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtor and various parties, may not have been finally agreed on, and may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtor and Sierra Vista are joint proponents of the Plan within the meaning of Bankruptcy Code § 1129. The Plan contains separate Classes and proposes recoveries for holders of Claims against and Member Interests in the Debtor. After careful review of the Debtor's current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtor has concluded that the recovery to Creditors will be maximized by the reorganization of the Debtor as contemplated by the Plan.

## B.    Notice to Holders of Claims and Member Interests

This Disclosure Statement is being used to solicit votes on the Plan only from holders of impaired Claims, and is being transmitted to Creditors with unimpaired Claims and to other parties in interest for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of an impaired Claim to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

On [_____], 2013 the Bankruptcy Court entered an order, attached as **Appendix 2** to this Disclosure Statement (the "**Disclosure Statement Order**"), approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Creditors to vote on the Plan as required by Bankruptcy Code § 1125. **The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or the Bankruptcy Court's endorsement of the Plan.**

Holders of Claims are encouraged to read this Disclosure Statement and its appendices carefully and completely before deciding to accept or reject the Plan. If a description in this Disclosure Statement and a term of the Plan conflict, the Plan governs.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtor nor Sierra Vista intend to update the information contained in this Disclosure Statement.

Except where specifically noted, the financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "**SEC**"), nor has the SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Member Interests in, the Debtor.

## C.    Summary Of Treatment Of Claims And Member Interests Under The Plan

The Plan constitutes a plan of reorganization for the Debtor. The Plan contains definitions and rules of interpretation and provides the treatment of separate classes for holders of Claims against, and Member Interests in, the Debtor. As provided by Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified.

The table below summarizes the classification and treatment of the principal prepetition Claims and Member Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section IV of this Disclosure Statement and Articles 2 and 3 of the Plan.

| Class | Description | Treatment |
|-------|-------------|-----------|
| | | |
| 1 | Priority Claims<br><br>(Unimpaired; deemed to accept) | Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as practicable; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of these two dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date. |
| | | |
| 2 | Secured Tax Claims<br><br>(Unimpaired; deemed to accept) | Each holder of an Allowed Secured Tax Claim will receive Cash in an amount equal to its Allowed Secured Tax Claim on the latest of: (i) the Effective Date, or as soon after that date as practicable; (ii) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (iii) 30 days after the Secured Tax Claim is Allowed; and (iv) the date on which the Secured Tax Claim is scheduled to be paid in the ordinary course of business under applicable law or regulation; unless, before the latest of the above dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date. Each holder of an Allowed Secured Tax Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Secured Tax Claim is paid in full under Section 3.02.b. If any portion of any Allowed Secured Tax Claim is not paid in accordance with Section 3.02.b and the Reorganized Debtor does not make that payment within ten days after notice of non-payment is received from the holder of the Claim, the holder may proceed with applicable state law remedies for collection of all amounts owing but not paid in accordance with Section 3.02.b. |

| Class | Description | Treatment |
|-------|-------------|-----------|
| 3 | Miscellaneous Secured Claim<br><br>**(Unimpaired; deemed to accept)** | Each holder of an Allowed Miscellaneous Secured Claim will receive Cash in an amount equal to its Allowed Miscellaneous Secured Claim on the latest of: (i) the Effective Date, or as soon after that date as practicable; (ii) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (iii) 30 days after the Miscellaneous Secured Claim is Allowed; and (iv) the date on which the Miscellaneous Secured Claim is scheduled to be paid in the ordinary course of business under applicable law or regulation; unless, before the latest of the above dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date. Each holder of an Allowed Miscellaneous Secured Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Miscellaneous Secured Claim is paid in full under Section 3.03.b. If any portion of any Allowed Miscellaneous Secured Claim is not paid in accordance with Section 3.03.b and the Reorganized Debtor does not make that payment within ten days after notice of non-payment is received from the holder of the Claim, the holder may proceed with applicable state law remedies for collection of all amounts owing but not paid in accordance with Section 3.03.b. |
| 4 | Sierra Vista Secured Claims<br><br>**(Impaired; entitled to vote)** | On account of and in full and final satisfaction of the Allowed Sierra Vista Secured Claims, and on account of the New Value Contribution, Sierra Vista or its designee will become the sole member of the Reorganized Debtor as of the Effective Date in accordance with the CHCDI Membership Substitution Agreement, Reorganized Certificate, and Reorganized Articles of Incorporation. |
| 5 | General Unsecured Claims<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Class 5 Claim receives, in full and final satisfaction of its Allowed Class 5 Claim, a Pro Rata beneficial interest in the Unsecured Creditor Fund vested in the Unsecured Creditors' Trust. |
| 6 | Member Interests<br><br>**(Impaired; deemed to reject)** | As of the Effective Date, any prepetition holder of a Member Interest will be substituted under terms of the CHCDI Member Substitution Agreement. The holder of the Member Interest will not receive or retain any rights, property, or distributions on account of its Member Interest under the Plan. |

**D.** **Voting Procedures, Ballots, and Voting Deadline**

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (**Appendix 1** and separately filed in this Chapter 11 Case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider confirmation of the Plan, and the time for filing objections to the confirmation of the Plan (the "**Confirmation Hearing Notice**"); and (3) if you are entitled to vote, one or more Ballots (and return envelopes along with detailed instructions accompanying the Ballots) to be used in voting to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by completing the appropriate Ballot. You must provide all the information requested on the Ballot; failure to do so may result in your vote being disqualified.

In order for your vote to be counted, your Ballot must be properly completed and **ACTUALLY RECEIVED** no later than [_____], 2013 at 5:00 p.m. Arizona Time (the "Voting Deadline") by counsel for the Debtor, whose address and contact information is on the Ballot.

**Ballots should not be sent or delivered to the Debtor, the Bankruptcy Court, or any other party other than counsel to the Debtor. Ballots not received by the Voting Deadline by Debtor's counsel will not be counted.**

If: (1) you have any questions about the procedure for voting or the packet of materials that you have received; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to either of those documents, please contact: Karen Graves; Squire Sanders (US) LLP; 1 E. Washington St., Suite 2700; Phoenix, AZ 85004; Telephone: (602) 528-4000; e-mail karen.graves@squiressanders.com.

**E.** **Confirmation Procedures**

Under Bankruptcy Code § 1126(f), if a class of claims or interests is unimpaired under a plan, that class (and each member of that class) is conclusively presumed to have voted in favor of the plan and is not solicited to vote on the plan. In this Chapter 11 Case, the Plan contains five Classes of Creditors and one Class of Member Interests. All unclassified Claims and Claims in Classes 1, 2 and 3 are unimpaired by the Plan and holders of such Claims are presumed to have voted in favor of the Plan and will not be solicited to vote on the Plan. All Claims in Classes 4 and 5 are impaired and holders of such Claims are entitled to vote to accept or reject the Plan. Class 6 is impaired under the Plan and members of that Class will neither receive nor retain any property on account of their Member Interests. Accordingly, members of Class 6 are deemed to reject the Plan and will not be solicited to vote on the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to begin on [_____], 2013 at [_____] a.m. (Arizona time) before the Honorable Brenda Moody Whinery, United States Bankruptcy Judge, at the United States Bankruptcy Court, 38 South Scott Avenue, Tucson, AZ 85701. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjournment date made at

the Confirmation Hearing. The Bankruptcy Court has ordered that any objections to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are actually received on or before [_____], 2013, at 5:00 p.m. (Arizona time) by counsel to the Debtor, counsel to Sierra Vista, and the Office of the United States Trustee.

**THE DEBTOR AND SIERRA VISTA BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTOR. THE DEBTOR AND SIERRA VISTA STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

## II.  BACKGROUND REGARDING THE DEBTOR

### A.  Overview of Business Operations

The Debtor operates as a non-profit, family-oriented health care system providing cost-effective essential medical care to people in Cochise County, and particularly the Douglas, Arizona area (including many indigent patients provided medical care through Arizona Health Care Cost Containment System, or "AHCCCS," as more fully described below).  The Debtor currently has approximately 100 employees and operates under the name Southeast Arizona Medical Center ("SAMC"). SAMC was originally built in 1910 when Cochise County moved its hospital from Tombstone, Arizona to Douglas, Arizona. Gradually, the County hospital became an acute care general hospital consisting of 49 beds, as well as a skilled nursing facility of 43 beds.  Cochise County operated the hospital into the 1950s and the land and buildings comprising SAMC are still owned by the County.  Indeed, the County is currently leasing the land to the Debtor at the rate of $1.00 per year.

In 1985, a non-profit corporation, known by the acronym CHAMA, ran SAMC until poor management decisions forced CHAMA into bankruptcy in 1998. The Debtor was formed in 2000 as a non-profit organization to bring the hospital under local control. After extensive negotiations with a Delaware bankruptcy court, the Debtor bought SAMC on April 5, 2001. At that time, a volunteer Board of Directors was established. Reorganization steps taken following the acquisition included the following:  (a) the skilled nursing facility was closed; (b) the obstetrics department was closed in 2002; (c) 20 to 25 employees were laid off; (d) the billing office and medical coding was returned to internal operations; and (e) insurance contracts were renegotiated for better reimbursement rates. As a result, the financial situation vastly improved. SAMC was designated, and remains to this day, a "critical access" hospital with 25 licensed beds.  SAMC has a 24-hour emergency room staffed with a full-time physician.  SAMC also offers full service radiology services, laboratory, physical therapy, and dietary departments. In 2004, a new CEO with a background in accounting and finance was hired. During his tenure, the hospital's financial situation continued to improve and many new services were started.  A rural health clinic was established and two physicians were hired.

### B.  Prepetition Debt

On June 14, 2011, the Debtor entered into the *Management Services and Support Agreement* with Sierra Vista (the "Management Agreement"). In addition to the Management Agreement, the Debtor and Sierra Vista have entered to: (i) a *Non-Revolving Line of Credit Promissory Note* dated July 7, 2011 (as amended, the "Original Note"), (ii) a *Security Agreement*, dated July 7, 2011 (as amended, the "Security Agreement"), (iii) a *Bridge Loan Promissory Note* dated January 4, 2013 (the "First Bridge Note"); and (iv) a *Second Multi-Advance Bridge Loan Promissory Note* dated February 1, 2013 (the "Second Bridge Note," and collectively with the Management Agreement, the Original Note, the Security Agreement, and the First Bridge Note, the "Existing Loan Documents"). As of the Petition Date, the total amount outstanding under the Existing Loan Documents was approximately $1.9 million.

PHOENIX/641542.3
Case 4:13-bk-01738-BMW   Doc 30   Filed 02/20/13   Entered 02/20/13 11:56:26   Desc
Main Document   Page 11 of 43

Due to declining reimbursement, however, a lack of in-patient census, the loss of revenue sources, and the inability to collect for services provided, the Debtor was unable to meet its obligations to Sierra Vista under the Existing Loan Documents and the Debtor was forced to file bankruptcy. Following the bankruptcy, Sierra Vista has advanced additional monies to the Debtor through Debtor-In-Possession financing and has agreed to acquire the Debtor, subject to any higher and better offers, as contemplated under the Plan and the CHCDI Member Substitution Agreement.

## C.    Events Precipitating the Chapter 11 Case

No single event has caused the Debtor to seek relief under Chapter 11 of the Bankruptcy Code. Rather, the Debtor has experienced several events and circumstances that, when combined with the fact the Debtor is significantly over leveraged, has made this bankruptcy case necessary.

For example, in 2009, AHCCCS chose to cut their reimbursement rate by 5% on every claim submitted, and six months later, decreased the reimbursement by an additional 5%. The Debtor continued to carry the burden of providing medical services to a disproportionate amount of patients with AHCCCS insurance, or no insurance at all. The result has put the Debtor in a position in which it cannot afford to cover operating expenses. In addition, under various federal regulations, the Debtor cannot turn away individuals requiring medical assistance, regardless of the ability to pay. Ultimately, declining reimbursements are simply not enough to cover expenses.

In addition, the Debtor has been required to electronically maintain all health records. With the intent of moving the Debtor into a position to improve collection and billing efforts, as well as to align the Debtor to receive an incentive payment from the federal government for electronic record-keeping, a hasty installation was completed. The new electronic records system was originally designed for a clinic – not a hospital. As such, the result was a hasty implementation schedule, inadequate staff training, and the need to modify and customize the system. These factors have led to a decline in the Debtor's collection efforts, both in terms of payments, and denial of coverage.

In addition to the factors above, as of the Petition Date, there were outstanding bills to vendors for supplies, and costs were increasing under necessary service agreements for aging equipment, as well as the maintenance of an aging facility. In the end, the hospital simply has debt obligations which it can no longer satisfy.

## III.    SIGNIFICANT EVENTS IN CHAPTER 11 CASE

## A.    Continuation of Business; Automatic Stay

The Chapter 11 Case was assigned to the Honorable Brendy Moody Whinery, United States Bankruptcy Judge for the District of Arizona. Since the Petition Date, the Debtor has continued to operate its business and manage its properties as debtor-in-possession under Bankruptcy Code §§ 1107(a) and 1108. No trustee has been appointed in the Chapter 11 Case.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under Bankruptcy Code § 362 that, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens

against property of the Debtor, and the commencement or continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to assess and reorganize its business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of the Plan.

**B.    "First Day" and Administrative Orders**

At the beginning of the Chapter 11 Case, the Bankruptcy Court entered several orders that the Debtor requested for purposes of maintaining ongoing business operations and to ensure that the Chapter 11 filings would not disrupt those operations. These orders, among other things, authorized the Debtor to pay certain prepetition claims and granted other relief necessary to facilitate the Debtor's transition between prepetition and postpetition business operations. The orders authorized, among other things:

- the retention of the Michael W. Carmel, LTD, as restructuring counsel to the Debtor;

- the maintenance of the Debtor's bank accounts and operation of its cash management system substantially as that system existed before the Petition Date and the continued use of existing business forms;

- approval of the DIP Facility (further described below); and

- the payment of employees' accrued prepetition wages and obligations associated with the Debtor's employee benefits plans.

**C.    The DIP Facility**

On _____, 2013, the Bankruptcy Court entered an order approving the DIP Facility (the "**DIP Financing Order**"). The DIP Facility was provided to the Debtor by Sierra Vista. Sierra Vista also holds prepetition secured claims against the Debtor totaling approximately $1.9 million.

Under the DIP Facility, Sierra Vista has committed to provide the Debtor with up to $1 million in postpetition financing to allow the Debtor to continue its business operations and has authorized the Debtor's use of the cash and other collateral, which is subject to the prepetition security interest of Sierra Vista. The Debtor's obligations under the DIP Facility are secured by, among other things:

(i) priming first priority liens on any and all current and future assets of the Debtor of any nature or type whatsoever including, without limitation, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plant and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (provided, however, that the liens and security interests upon the Debtor's real properties granted to Sierra Vista only extend to fifty percent of the value of Debtor's real properties);

(ii) super priority administrative claims against the Estate;

(iii) a first priority pledge of any and all capital stock and/or equity interest held directly or indirectly by the Company; and

(iv) control over the Company's bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature. The obligations under the DIP Facility are also entitled to a so-called "super priority" administrative claim under Bankruptcy Code § 364(c)(1).

In consideration for Sierra Vista's provision of the DIP Facility and consent to use of cash collateral, the Debtor acknowledged, among other things: (i) the Debtor was indebted to Sierra Vista without defense, counterclaim or offset in the amount of approximately $1.9 million, plus accrued and unpaid interest thereon and fees, expenses and other obligations incurred in connection with the Sierra Vista Secured Debt; (ii) that the Sierra Vista Secured Debt obligations of the Debtor to Sierra Vista constituted legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms; (iii) that no portion of the Sierra Vista Secured Debt obligations of the Debtor to Sierra Vista are subject to avoidance, recharacterization, recovery or subordination under the Bankruptcy Code or non-bankruptcy law; (iv) that the Debtor did not have, and released on behalf of itself but not the Estate, any claims, counterclaims, causes of action, defenses or setoff rights against Sierra Vista or its affiliates and (v) that all liens provided to Sierra Vista to secure the Sierra Vista Secured Debt held by Sierra Vista were valid, binding, perfected and enforceable first priority liens on substantially all of the Debtor's assets, not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or nonbankruptcy law and subject to only the priming lien of Sierra Vista and certain allowed liens.

## IV.    DESCRIPTION OF THE PLAN

### A.    Introduction

This section provides a summary of the Plan's structure, classification, treatment, and implementation. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to in the Plan, this Disclosure Statement does not purport to be a precise or complete statement of all the terms and provisions of the Plan or documents referred to in the Plan. Refer to the Plan and its exhibits for a complete statement of all the Plan's terms.

The Plan itself and the documents it refers to will control the treatment of holders of Claims against, and Member Interests in, the Debtor under the Plan and will, on the Effective Date, be binding on all parties-in-interest, including holders of Claims against, and Member Interests in, the Debtor and the Reorganized Debtor.

### B.    Summary of Claims Process, Bar Date, and Professional Fees

The Bankruptcy Court entered an order (the **"Bar Date Order"**) setting [_____], 2013 as the deadline for filing proofs of claim against the Debtor (the **"Bar Date"**), except for the claims of Governmental Units, which must be filed by [_____], 2013 under Bankruptcy Code § 502(b)(9). The Bar Date excludes certain Claims, including Administrative Claims (except

claims entitled to priority under Bankruptcy Code § 503(b)(9), which are subject to the Bar Date), Professional Fee Claims and Claims based on the rejection of executory contracts and unexpired leases following entry of the Bar Date Order, as to which the bar date is controlled by provisions of the Plan and orders of the Bankruptcy Court authorizing the rejection of contracts or leases. The Debtor's counsel provided notice of the Bar Date by mailing to each person listed in the Schedules a notice of the Bar Date, a copy of the Bar Date Order, and a proof of claim form. In addition, the Debtor published notice of the Bar Date in the [_____].

All Administrative Claims, Professional Fee Claims and Rejection Claims must be filed on or before the date that is the first Business Day that is 30 days after the Confirmation Date.

## C.     Classification and Treatment of Claims and Member Interests, Generally

Bankruptcy Code § 1122 requires that a plan of reorganization classify the claims of a debtor's creditors and the interest of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if the claim or interest is substantially similar to the other claims or interests of that class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Debtor and Sierra Vista believe that they have classified all Claims and Member Interests in compliance with the requirements of the Bankruptcy Code. If a holder of a Claim or Member Interest challenges the Plan's classification of Claims or Member Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor and Sierra Vista, to the extent permitted by the Bankruptcy Court, intend to modify the classifications of Claims or member Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. Except if a modification of classification adversely affects the treatment of a holder of a Claim or Member Interest, acceptance of the Plan by any holder of a Claim or Member Interest will be deemed to be a consent to the Plan's treatment of the holder of a Claim or Member Interest regardless of the class as to which that holder ultimately is deemed to be a member.

## D.     Treatment of Unclassified Claims

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims, Preserved Ordinary Course Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims, Preserved Ordinary Course Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Sections 2.02, 2.03 and 2.04 of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

1.     *Allowed Administrative Claims*

An Administrative Claim is a Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Bankruptcy Code §§ 503(b), 507(b) or 546(c)(2) and entitled to priority under Bankruptcy Code § 507(a)(1), including: (a) fees payable under 28 U.S.C. § 1930;

(b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case; and (d) all Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code §§ 330, 331, or 503.

The Debtor estimates that, assuming an Effective Date around May 15, 2013 and assuming no Professionals have been retained by a Committee, unpaid Allowed Administrative Claims will total approximately $60,000, comprising approximately $50,000 in Professional Fees—which will be payable from a Carveout under the DIP Facility—and approximately $7,500 in accrued but unpaid postpetition management fees owing to Sierra Vista or other administrative costs.

     2.    *Preserved Ordinary Course Administrative Claims*

These are generally Claims for liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case relating to the purchase, lease, or use of goods and services, including services provided by the Debtor's employees.

     3.    *Priority Tax Claims*

These are Claims of a Governmental Unit for taxes entitled to priority under Bankruptcy Code § 507(a)(8).

     4.    *Professional Fees*

Claims for Professional Fees are Claims of Professionals, including an entity (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§ 327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b).

     5.    *Treatment.*

     (i)    <u>Allowed Administrative Claims</u>. Each Allowed Administrative Claim (other than a Preserved Ordinary Course Administrative Claim or Professional Fee Claim) will be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (c) 30 days after the Claim is Allowed; and (d) any date on which the holder of the Claim and the Debtor or the Reorganized Debtor agree.

     (ii)    <u>Preserved Ordinary Course Administrative Claims</u>. Each Allowed Preserved Ordinary Course Administrative Claim will be paid in full in Cash at the Reorganized Debtor's election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) in the ordinary course of Reorganized Debtor's business. Payments will be made without further action by the holder of the Preserved Ordinary Course Administrative Claim.

(iii) <u>Allowed Priority Tax Claims</u>. Any Allowed Priority Tax Claim will be paid in full in Cash on the later of the Effective Date (or as soon after that date as practicable) and 30 days after the Claim is Allowed, but the Debtor or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan. If the Debtor or the Reorganized Debtor so elect, the installment payments will be made in equal quarterly installments of principal plus interest, at a rate determined under applicable nonbankruptcy law, on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date. The first payment will be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after than date as practicable; and (c) another date on which the holder of the Claim and the Debtor or the Reorganized Debtor agree. The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

(iv) <u>Professional Fee Claims</u>. Each Allowed Professional Fee Claim will be paid in full in Cash: (a) no later than three days after the Professional Fee Claim is Allowed; (b) on any other terms the holder of an Allowed Professional Fee Claim and the Debtor or the Reorganized Debtor may agree; or (c) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Reorganized Debtor its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by the Professional Fee Bar Date.

All claims of Professionals for services rendered or expenses incurred after the Confirmation Date in connection with the Chapter 11 Case and the Plan including those relating to consummation of the Plan, any appeal of the Confirmation Order, the preparation, filing, and review of Professional Fee Claims, the prosecution of Avoidance Actions and Preserved Litigation Claims, and the resolution of Disputed Claims, will be paid by the Reorganized Debtor on receipt of an invoice, or on other terms on which the Reorganized Debtor and the Professional agree, without the need for further Bankruptcy Court authorization or entry of a Final Order. The Reorganized Debtor has ten days after receiving a Professional's invoice to object to any item contained in that invoice. If the Reorganized Debtor and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to the Professional, the Bankruptcy Court will determine that amount.

(v) <u>Sierra Vista DIP Lending Claims</u>. On the Effective Date, all the Debtor's obligations to the Sierra Vista under the DIP Facility and the DIP Loan Documents will be fully and finally satisfied as part of the treatment for Class 4 described in Section 3.04 of the Plan.

**E.    Treatment of Classified Claims and Interests**

In accordance with Bankruptcy Code § 1123(a)(1), set forth below is a designation of classes of Claims against, and Member Interests in, the Debtor (except the unclassified Claims

receiving the treatment described in Section IV.D above). A Claim or Member Interest is placed in a particular Class for the purpose of receiving distributions in accordance with the Plan only to the extent that a Claim or Member Interest has not been paid, released, or otherwise settled before the Effective Date. The treatment of classified Claims and Member Interests and the provisions governing distributions on account of Allowed Claims and Allowed Member Interests is set forth in Articles 3 and 4 of the Plan. You should refer to the Plan itself for the complete provisions governing the treatment of your particular Claim or Member Interest.

1.   *Class 1 (Priority Claims)*

Class 1 consists of all Priority Claims other than Priority Tax Claims. Class 1 is unimpaired by the Plan. All holders of Allowed Priority Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan.

Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as practicable; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of these two dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date.

The Debtor is unaware of any significant Allowed Priority Claims that will remain unpaid as of the assumed Effective Date of the Plan.

2.   *Class 2 (Secured Tax Claims)*

Class 2 consists of all Secured Tax Claims. Each holder of a Secured Tax Claim is considered to be in its own separate subclass within Class 2, and each subclass is deemed to be a separate Class for purposes of the Plan. Class 2 is unimpaired by the Plan. All holders of Allowed Secured Tax Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan.

Each holder of an Allowed Secured Tax Claim will receive Cash in an amount equal to its Allowed Secured Tax Claim on the latest of: (i) the Effective Date, or as soon after that date as practicable; (ii) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (iii) 30 days after the Secured Tax Claim is Allowed; and (iv) the date on which the Secured Tax Claim is scheduled to be paid in the ordinary course of business under applicable law or regulation; unless, before the latest of the above dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date. Each holder of an Allowed Secured Tax Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Secured Tax Claim is paid in full under Section 3.02.b of the Plan. If any portion of any Allowed Secured Tax Claim is not paid in accordance with Section 3.02.b of the Plan and the Reorganized Debtor does not make that payment within ten days after notice of non-payment is received from the holder of the Claim, the holder may proceed with applicable state law remedies for collection of all amounts owing but not paid in accordance with Section 3.02.b of the Plan.

The Debtor is unaware of any significant Secured Tax Claims that will remain unpaid as of the assumed Effective Date of the Plan.

3.    *Class 3 (Miscellaneous Secured Claims)*

Class 3 consists of all Secured Claims other than the Secured Tax Claims in Class 2 and the Sierra Vista Secured Claims in Class 4. Each holder of a Miscellaneous Secured Claim is considered to be in its own separate subclass within Class 3, and each such subclass is deemed to be a separate Class for purposes of the Plan. Class 3 is unimpaired by the Plan. All holders of Allowed Miscellaneous Secured Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan.

Each holder of an Allowed Miscellaneous Secured Claim will receive Cash in an amount equal to its Allowed Miscellaneous Secured Claim on the latest of: (i) the Effective Date, or as soon after that date as practicable; (ii) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (iii) 30 days after the Miscellaneous Secured Claim is Allowed; and (iv) the date on which the Miscellaneous Secured Claim is scheduled to be paid in the ordinary course of business under applicable law or regulation; unless, before the latest of the above dates, the holder of the Claim and the Reorganized Debtor agree in writing to a different date. Each holder of an Allowed Miscellaneous Secured Claim retains all Liens on applicable property of the Estate arising under applicable law until that holder's Allowed Miscellaneous Secured Claim is paid in full under Section 3.03.b of the Plan. If any portion of any Allowed Miscellaneous Secured Claim is not paid in accordance with Section 3.03.b of the PLan and the Reorganized Debtor does not make that payment within ten days after notice of non-payment is received from the holder of the Claim, the holder may proceed with applicable state law remedies for collection of all amounts owing but not paid in accordance with Section 3.03.b of the Plan.

The Debtor is unaware of any significant Miscellaneous Secured Claims that will remain unpaid as of the assumed Effective Date of the Plan.

4.    *Class 4 (Sierra Vista Secured Claims)*

Class 4 consists of all Sierra Vista Secured Claims. Class 4 is impaired by the Plan. Sierra Vista is entitled to vote on the Plan.

On account of and in full and final satisfaction of the Allowed Sierra Vista Secured Claims, and on account of the New Value Contribution, Sierra Vista or its designee will become the sole member of the Reorganized Debtor as of the Effective Date in accordance with the CHCDI Membership Substitution Agreement, Reorganized Certificate, and Reorganized Articles of Incorporation.

The Debtor believes that Allowed Sierra Vista Secured Claims will total approximately $2.9 million (comprising approximately $1.9 million in prepetition Secured Claims of Sierra Vista, and up to $1.0 million the Sierra Vista DIP Lending Claims).

5.    *Class 5 (General Unsecured Claims)*

Class 5 consists of all General Unsecured Claims. Class 5 is impaired by the Plan. All holders of General Unsecured Claims are entitled to vote on the Plan.

Each holder of an Allowed Class 5 Claim receives, in full and final satisfaction of its Allowed Class 5 Claim, a Pro Rata beneficial interest in the Unsecured Creditor Fund vested in the Unsecured Creditors' Trust.

The Debtor estimates that General Unsecured Claims will total approximately $1,600,000.

6.    *Class 6 (Member Interests)*

The Co-Proponents believe there are no holders of prepetition Member Interests. To the extent there are any prepetition Member Interest holders, Class 6 consists of the Member Interest. Class 6 is impaired by the Plan. All holders of Member Interests are deemed to reject the Plan and will not be solicited to vote on the Plan.

As of the Effective Date, any prepetition holder of a Member Interest will be substituted under terms of the CHCDI Member Substitution Agreement. The holder of the Member Interest will not receive or retain any rights, property, or distributions on account of its Member Interest under the Plan.

## V.    IMPLEMENTATION OF THE PLAN

### A.    Plan Funding

1.    *Effective Date Payments.*

Funds needed to make Cash payments on the Effective Date on account of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Miscellaneous Secured Claims, and Allowed Secured Tax Claims under the Plan will come from the Gross Assets.

2.    *Unsecured Creditor Fund*

Cash needed to fund the Unsecured Creditors Fund will come from the New Value Contribution to be provided by Sierra Vista under the CHCDI Member Substitution Agreement.

### B.    CHCDI Member Substitution Agreement

1.    *Member Substitution.*

Under the CHCDI Member Substitution Agreement, Sierra Vista will become the sole member of the Reorganized Debtor in exchange for: (i) satisfaction and release of the Allowed Sierra Vista Secured Claim; (ii) satisfaction and release of the Sierra Vista DIP Lending Claims; and (iii) payment of the New Value Contribution. The CHCDI Member Substitution Agreement will be approved by the Bankruptcy Court as part of the Confirmation Order and under Bankruptcy Code §§ 363(d), 541(f) and 1129(a)(16).

2.    *Compliance with Arizona Revised Statute § 10-11253*

Arizona Revised Statute § 10-11253 requires a hearing officer conduct a public hearing

to provide certain information regarding the sale, transfer, merger or other similar transaction involving a nonprofit health care entity such as the Debtor. Under the Disclosure Statement Order, the Honorable Brenda Moody Whinery, United States Bankruptcy Judge, will act as the hearing officer and the Confirmation Hearing will constitute the public hearing under A.R.S. § 10-11253(C)(1).

Arizona Revised Statute § 10-11253(F) further requires disclosure of the following information in connection with a sale, transfer, merger or other similar transaction involving a nonprofit health care entity such as the Debtor.

(i) Community Impact & Continued Use of Assets for Community Benefit. Sierra Vista intends to continue operating the SAMC facility to provide medical services in the Douglas area after implementation of the Member Substitution Agreement transaction as contemplated under the Plan. The proposed transaction under the Plan will deleverage the Debtor and prevent immediate liquidation of the Debtor, both of which will enhance the Debtor's community benefit purposes.

(ii) Affect on Access to HealthCare Services. The proposed transaction under the Plan will have a positive affect on the access to and availability of health care services in the Douglas area by providing the means for the Debtor's continued operations. In the alternative, if the Debtor were to liquidate, access to and availability of health care services in the Douglas area would be negatively impacted.

(iii) Insider Benefits. The proposed transaction under the Plan will not provide any director, officer, agent or employee of the Debtor with any community benefit asset, nor will the proposed transaction under the Plan provide any director, officer, agent or employee of the Debtor with any direct or indirect financial benefit.

(iv) Due Diligence. The Debtor has determined in its best business judgment that the proposed Member Substitution Agreement and treatment contemplated under the Plan is a necessity if the Debtor is to avoid ceasing operations entirely. Terms of the Member Substitution Agreement and treatment under the Plan is the result of good faith, arm's-length negotiations between the Debtor and Sierra Vista.

(v) Post-Confirmation Management. As more fully described in Section V.D, below, many members of the Reorganized Debtor's board of directors reside in or near the Douglas, Arizona area.

(iv) Sierra Vista is an Arizona Nonprofit Corporation. Under the proposed Management Substitution Agreement, Sierra Vista will be appointed the sole member of the Reorganized Debtor. Sierra Vista is an Arizona nonprofit corporation.

3. *Section 1145 Exemption.*

In accordance with Bankruptcy Code § 1145, the appointment of Sierra Vista as sole member of the Reorganized Debtor under the Plan is exempt from the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in such

securities and is deemed to be a public offer of such securities.

**C.   Certificate of Incorporation and By-Laws.**

As of the Effective Date and without any further action by the shareholders or directors of the Debtor or the Reorganized Debtor, the Debtor's certificate of incorporation and articles of incorporation will be amended and restated substantially in the forms of the Reorganized Certificate and the Reorganized Articles of Incorporation. The Reorganized Certificate and the Reorganized Articles of Incorporation will prohibit (to the extent required by Bankruptcy Code § 1123(a) and (b)) the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend its certificate of incorporation and by-laws as permitted by applicable law.

**D.   Post-Confirmation Management**

The post-confirmation Directors of the Reorganized Debtor will be:

**Bruce W. Dockter** - Bruce retired in 2005 as a civilian employee of the Department of the Army after a 39-year career in the field of financial management. His final assignment was as the Assistant Chief of Staff for Resource Management (Chief Financial Officer) for the Army Network, Enterprise Technology Command at Ft. Huachuca, Arizona. Bruce received his Bachelor of Arts Degree with a major in Political Science (International Relations) from the University of Utah. He received his Master of Business Administration Degree from Syracuse University and also attended numerous Executive Level management courses offered by the Defense Department and Office of Personnel Management. He was an examiner for the President's Quality Award, the Federal Government's equivalent of the Malcom Baldrige National Quality Award. Bruce has been a resident of Sierra Vista, Arizona since 1979. In addition to his duties on the Board of Trustees, Bruce is a member of the Sierra Vista Rotary Club, serving as Rotary Foundation Chair. He is also Past President of the Sierra Vista Symphony Association.

**Joanna K. Michelich** - Joanna K. Michelich, Ph.D., retired in 2009 as the Executive Vice President/Provost of Cochise College, the largest rural community college in Arizona. Her higher education career spanned 39 years with positions held in North Dakota, Washington, Michigan, and Arizona, the last 11 years at Cochise College. She also was co-owner and partner in a higher education/organizational development consulting firm, SunWest Educational Associates, Inc., of Casa Grande, Arizona, for over 5 years. Raised in Douglas, Arizona, Dr. Michelich earned her AA degree from Cochise College, her BS in English Education degree from Northern Arizona University, a master's degree in counseling and student personnel services from The University of Arizona, and a Ph.D. in higher education from Washington State University. Active in both higher education and civic leadership positions throughout her career, she served as president of the Arizona Association of Community College Student Personnel Administrators, president of the Arizona Association of Academic Administrators Association, published articles on various higher education topics in professional refereed journals, and has made numerous presentations at state, regional, and national meetings of various higher education organizations. She was the recipient of the "Outstanding Community College Alumni Award for 1964-1978" presented by Cochise College and the State Board for Community

Colleges of Arizona in 1978 and the National Institute for Staff and Organizational Development award for excellence in teaching and learning in 2008. Locally, she has served as a member of the Sierra Vista Herald's readers' advisory board, Vice Chair and board member of the Center for Academic Success, Chair of the Team Cochise-Education Committee, and a member of the Sierra Vista Rotary Club. Currently, Dr. Michelich serves as Chair of the Cochise Community Foundation advisory board and is a member of the Church Council for the Sierra Vista Evangelical Lutheran Church. She received the Outstanding Trustee of the Year award in 2010. Recently, Dr. Michelich was appointed to a Blue Ribbon Panel on Governance for the American Hospital Association's Center for Healthcare Governance.

**William Miller** - Mr. Miller is the Chief of Fry Fire District in Sierra Vista and has been with the department since 1976. He holds a Bachelor's Degree in Fire Science and is a National Certified Emergency Manager and Board Certified in Homeland Security. He is also certified to instruct Hazardous Material classes as well as teaching qualifications for Fire Service Instructor, Wildland Fire Operations, Emergency Response to Terrorism Operations and many other safety and emergency related education. He is District 2 representative for the Arizona Fire District Association, Chairperson for the Cochise County EMS Council and is past president of the Sierra Vista Rotary Club. He's on the board of directors for the Arizona Fire District Association, Vice-Chairman of the Southern Arizona Emergency Medical Council, and Chairperson for the Cochise County Emergency Medical Council and serves on several other community and state boards. He was also recognized with the prestigious United States National Award for a lifesaving event that honored him with the Benjamin Franklin Fire Service Award, and most recently being awarded the Department of Defense Commander's Award for Public Service. Chief Miller is a past President of the Sierra Vista Noon Rotary Club and was awarded the Rotarian of the Year in 2000.

**Lanny Kope** - Dr. Kope has served as chair and member of the Committee on Governance and the Leadership Development Committee of the American Hospital Association. He was also a member of the Joint Commission Leadership Accountability Task Force as well as a member of the AHA Congress of Trustees. He was founding chairman and speaker at the Western Regional Trustee Symposium and Regional Trustee Chair and Delegate to AHA Region Policy Board 8. He has served as Chair of PMH Health Resources and Phoenix Memorial Hospital in Phoenix, Chair of Arizona Hospital Federation, Chair of Payson Regional Medical Center Foundation and Board member. He holds a Doctorate of Education from Arizona State University. Dr. Kope has an extensive background in education administration and was Deputy Director of Navajo-Hope Indian Relocation Commission. Dr. Kope is also a retired Colonel US Marine Corps Reserves. His long service history included the Marine Helicopter Group, 9th Engineer Company where he was platoon commander and also served with the Reserve Liaison and Support Group at Camp Pendleton as assistant communications officer

**Ron Wagner** - Ron served as Chairman of the Sierra Vista Regional Health Center Board of Trustees from 2006 to 2008. He has been a member of the Board since September of 2000 and has served on the Finance, Strategic Planning, Executive, Governance and Executive Compensations Committees. Also a life member of the SVRHC Auxiliary. Ron retired after selling his business, Mountain Vista Supply, a local wholesale electrical distribution company in 2008. He was previously president of the local Economic Development Foundation Board and has served on numerous committees of the Chamber of Commerce. Now an Advisory Board

Case 4:13-bk-01738-BMW    Doc 30    Filed 02/20/13    Entered 02/20/13 11:56:26    Desc
Main Document    Page 23 of 43

Member of the Cochise Community Foundation. He is a graduate of Pima Community College in Tucson.

**John P. Haun** - Dr. Haun is semi-retired as a staff physician with Chiricahua Community Health Centers in Elfrida, AZ. He has previously been Vice President of Medical Affairs at CHI/St. Joseph Hospital in Lancaster, PA Vice President of Medical Affairs at Southeast Ohio Regional Medical Center in Cambridge, Ohio where he was also in family practice. He graduated from Ohio State University college of Medicine in Columbus Ohio and interned at Springfield City Hospital in Springfield, Ohio and did residency in anesthesia at Ohio Valley Medical Center in Wheeling, WV. Dr. Haun is Board Certified in Family Practice and Medical Management. Dr. Haun serves on the Quality Council and is the Board representative at Medical Executive and Credentials Committees of the medical staff.

**David J. Knapp** - Dr. Knapp is a Board Certified Internist and has been in private practice in Sierra Vista since 1995. He is a long-time member of and active in the parish of St. Andrew the Apostle Catholic Church. He retired as a Lieutenant Colonel in the US Army Reserves. He was an active duty physician during Operation Desert Storm and also served in the Army during the Vietnam era. He has held many medical staff department chairs and served on the Medical Executive Committee at SVRHC.

**Susan Warne** - Ms. Warne is a retired Elder Law Attorney. She is a former PIO/Risk Communication Officer of the Cochise County Health Department as well as the Southeast Arizona Governments Organization, an agency that serves local governments in southeastern Arizona. Ms. Warne has also been involved with DV-ACT (Domestic Violence Awareness & Collaboration Team) the Sierra Vista Bar Association and the Cochise County Chapter AWLA. She also was the Coordinator for Turning Point, a WK Kellogg funded multi-year grant. After leaving the Health Department she worked as an Ombudsman for the Area Agency on Aging (SEAGO) advocating for seniors in local nursing homes and assisted living facilities. Prior to moving to Cochise County, Ms. Warne practiced law for a number of years. Her practice included a two-year stint as a Legal Services attorney on the Tohono O'odham reservation. Previous to that she worked for several years at Guam Legal Services, Territory of Guam, as an Elder Law Attorney. She also practiced law in the State of Oregon. Ms. Warne is licensed to practice law in the State of Arizona, State of Oregon, and Territory of Guam. Ms. Warne holds a law degree from the University of Oregon, and graduated summa cum laude from Southern Oregon University with two degrees, one in Criminology (Corrections) and one in Psychology (Counseling). A few of her community activities have included work as a volunteer at C.A.N.T.E.R., membership in Friends of the Huachuca Mountains, the Cochise Elder Abuse Prevention Partnership, the Think Tank, DV-ACT, and the Readers Advisory Board to the SV Herald.

**Virginia Studer** - Rev. Studer is Co-Pastor of Faith Presbyterian Church in Sierra Vista since 2000 and was ordained as a Presbyterian Minister in 1991. She was previously spiritual care provider for Valor Hospice Care and served as hospital chaplain at Provident St. peter Hospital in Olympia, WA and St John's Regional Medical Center in Oxnard, CA. She has served on the Governor's Advisory Council on Aging in Phoenix, and is Board Certified in the Association of Professional Chaplains. She is the mother of two teenage daughters.

Case 4:13-bk-01738-BMW    Doc 30    Filed 02/20/13    Entered 02/20/13 11:56:26    Desc
                          Main Document        Page 24 of 43

**Elizabeth Patten** - Elizabeth is a retired civil servant, who worked for the US Army Signal Command and NETCOM until her retirement. Her field of expertise has been Force Structure and Manpower Management. She is past president and secretary of the Huachuca Saddle Club, Catholic OLM, and past president and secretary of American Society of Military Comptrollers. She has lived in Sierra Vista for 26 years and is a graduate of Buena High School in Sierra Vista.

The post-confirmation Officers of the Reorganized Debtor will be chosen by the Reorganized Debtor's Directors.

The Reorganized Debtor will provide all its directors and officers with indemnification rights and a D&O Policy, and will compensate its directors and officers, in accordance with practices customary for entities of its type.

**E.      Unsecured Creditor Trust.**

On the Effective Date, the Unsecured Creditor Trust will be formed, the proceeds of the New Value Contribution will vest in the Unsecured Creditor Trust and the Unsecured Creditor Trustee will begin serving for the benefit of all holders of Allowed Claims in Class 5, which will become the beneficiaries of the Unsecured Creditor Trust.

(i)      <u>Unsecured Creditor Trustee</u>. The Unsecured Creditor Trustee may make distributions to the beneficiaries of the Unsecured Creditor Trust strictly in accordance with the terms of the Plan and must use his best efforts to liquidate all trust assets, make timely distributions, and not unduly prolong the existence of the Unsecured Creditor Trust.

(ii)      <u>Disputed Claims</u>. The Unsecured Creditor Trustee will have authority to, among other things, review any Claims in Class 5 and file or litigate objections to the allowance of any such Claims and seek to estimate them and to prosecute, enforce, compromise, settle or release such Claims. Costs to determine claims in Class 5 will be borne by the Unsecured Creditors' Trust. The Unsecured Creditor Trustee must manage distributions from Unsecured Creditor Trust so as to reserve sufficient Cash to make appropriate distribution on account of any Disputed Unsecured Claim that would have been entitled to distribution if that Disputed Unsecured Claim were an Allowed Unsecured Claim on the Effective Date in the Maximum Amount. If and when any Disputed Unsecured Claim becomes an Allowed Unsecured Claim, Cash from the Unsecured Creditor Trust sufficient to make appropriate distribution under the Plan on account of that Claim will be made from such reserves. If a Disputed Unsecured Claim becomes a Disallowed Unsecured Claim, all reserved distributions attributable to that Disputed Unsecured Claim will become available for Pro Rata distribution to all Allowed Unsecured Claims as beneficiaries of the Unsecured Creditor Trust.

## VI.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Contracts and Leases**

All executory contracts and unexpired leases set forth on the schedule of assumed executory contracts and unexpired leases filed with the Bankruptcy Court as part of the Plan Supplement will be deemed assumed by the Reorganized Debtor or assumed and assigned (as

indicated in the Plan Supplement) as of the Effective Date, except for any executory contract or unexpired lease: (i) that has been rejected in accordance with a Final Order entered before the Confirmation Date; or (ii) as to which a motion to reject has been filed with the Bankruptcy Court before the Confirmation Date.

All executory contracts and unexpired leases either (i) set forth on the schedule of rejected executory contracts and unexpired leases filed with the Bankruptcy Court as part of the Plan Supplement or (ii) existing but not listed in the Plan Supplement will be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been assumed or rejected in accordance with a Final Order entered on or before the Confirmation Date.

Entry of the Confirmation Order constitutes: (a) the approval under Bankruptcy Code § 365 of the assumption or assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned under the Plan or otherwise during the Chapter 11 Case; and (b) the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan or otherwise during the Chapter 11 Case. Notwithstanding anything contained in Section 5.02 of the Plan to the contrary, the Debtor retains the right to add or change the treatment (assumed or rejected) of any executory contract or unexpired lease in the Plan Supplement, thus changing the treatment of the contract or lease under the Plan, at any time within 30 days after the Effective Date.

**B.      Cure of Defaults**

On the Effective Date or as soon after that date as practicable, the Reorganized Debtor will Cure any defaults under any executory contract or unexpired lease assumed or assumed and assigned under the Plan. The Reorganized Debtor will not, and need not as a condition to assuming or assuming and assigning any executory contract or unexpired lease under the Plan, Cure any default that need not be cured in accordance with Bankruptcy Code § 365(b).

**C.      Rejection Damages Bar Date**

All Rejection Claims arising from the rejection of any executory contract or unexpired lease under the Plan are required to be filed with the Bankruptcy Court no later than the Rejection Claims Bar Date. Any such Claim not filed within that time will be forever barred. With respect to any executory contract or unexpired lease rejected by the Debtor before the Confirmation Date, the deadline for filing a Rejection Claim remains the deadline set forth in the order of the Bankruptcy Court authorizing that rejection. If such an order did not contain such a deadline, the deadline for filing a Rejection Claim arising from that rejection is the Rejection Claims Bar Date.

**D.      Indemnification Obligations**

Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan or employee benefit program of the Debtor, under charter, by-laws, contract, or applicable state law is deemed to be an executory contract and assumed by the Reorganized Debtor as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including but not limited to any officer or director of the Debtor, or any agent, professional,

financial advisor, or underwriter of any securities issued by the Debtor related to any acts or omissions occurring before the Petition Date is rejected and canceled under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date), and any Claim resulting from this rejection and cancellation in favor of any Person must be filed no later than 60 days after the Confirmation Date. Notwithstanding any of the foregoing, nothing contained in the Plan affects, impairs, or prejudices the rights of any Person covered by any applicable D&O Policy with respect to any such policy. Moreover, the Reorganized Debtor will maintain in force for three years following the Effective Date appropriate D&O Policies covering pre-Effective Date directors and officers of the Debtor and containing substantially the same provisions and limits of coverage as the policies that were in force on the Petition Date. The Reorganized Debtor will be responsible for paying the deductible or retention amounts under the D&O Policies for that three-year period.

## VII.    DESCRIPTION OF OTHER PROVISIONS OF THE PLAN

### A.    Vesting of Assets

Except as provided in the Plan, the Confirmation Order, or the Plan Documents, all property of the Estate will vest in the Reorganized Debtor on the Effective Date free and clear of all Liens and Claims of all kinds existing before the Effective Date. From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan or the Confirmation Order.

### B.    Discharge

Except as provided in the Plan or the Confirmation Order, the rights granted under the Plan and the treatment of Claims and Member Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on General Unsecured Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation of the Plan discharges the Debtor and the Reorganized Debtor from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h) or 502(i), whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code § 501; (b) a Claim based on such debt is Allowed under Bankruptcy Code § 502; or (c) the holder of a Claim based on such debt has accepted the Plan. Without limiting the foregoing, the discharge granted under the Plan is granted to the fullest extent allowed under Bankruptcy Code §§ 1141(a), 1141(b), 1141(c), and 1141(d)(1).

### C.    Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability that is unclassified by the Plan or that is classified by Article 3 of the Plan or that is subject to a distribution under the Plan, or an Member Interest or other right of an equity security holder that is subject to a distribution under the Plan are permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Equity Related Claims, or

Member Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against any property to be distributed under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any property to be distributed under the Plan; (c) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the Plan; and (d) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code. Nothing in this Section 10.03 or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan. Nothing in this Section 10.03 or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of the Estate (through the Reorganized Debtor as its representative or otherwise) or the Reorganized Debtor to assert and prevail on any Avoidance Action or Preserved Litigation Claim. Nothing in this Section 10.03 or elsewhere in the Plan enjoins or otherwise precludes (or may be construed to enjoin or otherwise preclude) any party in interest from enforcing the terms of the Plan and the Confirmation Order.

**D.      Exculpation**

None of the Debtor, the Reorganized Debtor, any Committee, or any of their respective members, officers, directors, employees, advisors, professionals, or agents have or will incur any liability to any holder of a Claim or Member Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, the Reorganized Debtor, any Committee, and each of their respective members, officers, directors, employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

**E.      Preserved Litigation Claims and Disputed Claims Resolution**

Notwithstanding anything to the contrary in the Plan, any non-Debtor party to a Preserved Litigation Claim or a Disputed Claim that has obtained or obtains relief from the automatic stay or from the injunction provisions contained in Section 10.03 of the Plan to pursue resolution of their Claim in a forum other than the Bankruptcy Court will not be deemed to have violated any provision of the Plan by seeking a resolution as to Allowance, Disallowance, or amount of the Claim in the other forum, but the classification and distributions on account of the Claim, once liquidated and Allowed or Disallowed, remain solely and exclusively subject to the Bankruptcy Court's continuing jurisdiction under Article 11 of the Plan and the terms and conditions of the Plan.

**F.      Avoidance Actions**

All Avoidance Actions and Preserved Litigation Claims are retained and reserved for the Reorganized Debtor, which is designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Avoidance Actions and Preserved Litigation Claims. The Reorganized Debtor will have exclusive authority to prosecute, defend, compromise, settle, and

otherwise deal with any Avoidance Actions and Preserved Litigation Claims, and will do so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). The Reorganized Debtor will pay the fees and costs associated with litigating the Avoidance Actions and the Preserved Litigation Claims. the Reorganized Debtor will have sole discretion to determine in its business judgment which Avoidance Actions and Preserved Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

## G.    Preservation of Insurance

The discharge and release from Claims as provided in the Plan, except as necessary to be consistent with the Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person.

## H.    Releases by Debtor

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, the Debtor, in its individual capacity for and on behalf of their Estate, will be deemed to forever release, waive, and discharge all Released Parties from all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to (i) the Debtor, (ii) the Chapter 11 Case and the conduct thereof, and (iii) the Plan. The Reorganized Debtor will be bound, to the same extent the Debtor is bound, by all of the releases set forth in Section 10.07 of the Plan.

## I.    Releases by Holders of Claims and Member Interests

As of the Effective Date, each holder of an Impaired Claim or Impaired Member Interest shall in consideration for the obligations of the Debtor and Reorganized Debtor under this Plan and the securities, contracts, instruments, releases and other agreements or documents to be delivered in connection with this Plan, forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the Debtor's or Reorganized Debtor's obligations under this Plan and the securities, contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case or the conduct thereof, or the Plan against: (i) the Debtor; (ii) the Reorganized Debtor; and (iii) the Released Parties.

## J.    Retention of Jurisdiction After the Effective Date

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain as much jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible including jurisdiction to:

a.  Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

b.  Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

c.  Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising from, or Cure related to, assumption or rejection;

d.  Ensure that distributions required under the Plan are accomplished in accordance with the Plan;

e.  Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor that may be pending on the Effective Date;

f.  Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

g.  Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

h.  Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document issued, entered into, filed or delivered in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

i.     Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

j.     Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k.     Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

l.     Issue a final decree and enter an order closing the Chapter 11 Case; and

m.     Adjudicate the Disputed Claims, the Avoidance Actions, and the Preserved Litigation Claims and any other cause of action or claims of the Debtor or the Estate.

## VIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A. Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims and Member Interests accept the Plan, except under certain circumstances. Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code § 1126(d), a Class of Member Interests has accepted the Plan if holders of such Member Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code § 1126(f) deems a Class of Claims or Member Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code § 1124. Classes 1, 2, and 3 under the Plan are unimpaired and, therefore, are deemed to accept the Plan. Classes 4 and 5 are impaired under the Plan and, therefore, will be solicited to vote on the Plan. Class 7 under the Plan is impaired but will receive or retain no property under the Plan and, therefore, Class 7 is deemed to reject the Plan without voting.

### B. Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is referred to as the "feasibility" requirement. The Debtor and Sierra Vista believe that it will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

The Plan effectively contemplates a sale of the Debtor's member interest to Sierra Vista in exchange for satisfaction of Sierra Vista's prepetition and postpetition secured claims against the Debtor, as well as payment of the New Value Contribution. Feasibility of the Plan is primarily a factor of Sierra Vista's ability to make the New Value Contribution, and the Reorganized Debtors' ability to pay the Preserved Ordinary Course Administrative Claims. To demonstrate the feasibility of the Plan, the Debtor and Sierra Vista refer to the feasibility analysis included in the Plan Supplement (the "**Feasibility Analysis**"). The Feasibility Analysis demonstrates that the Debtor will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments required to be made on the Effective Date, and sufficient Cash at relevant times to satisfy all obligations under the Plan to all Creditors in all Classes. The Feasibility Analysis based on a revised business model for the Reorganized Debtor. The operational assumptions regarding revenue performance and expenses are included in the Feasibility Analysis.

Accordingly, the Debtor and Sierra Vista believe that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11). The Debtor and Sierra Vista caution that no representations can be made as to the accuracy of the Feasibility Analysis or as to the Reorganized Debtor's ability to achieve the projected results. Certain of the assumptions on which the Feasibility Analysis are based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Feasibility Analysis was prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

The Feasibility Analysis was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Feasibility Analysis has not been audited by the Debtor's independent accountants. Although presented with numerical specificity, the Feasibility Analysis is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond the Debtor's control. Consequently, the Feasibility Analysis should not be regarded as a representation or warranty by the Debtor or any other Person, that projections will be realized. Actual results may vary materially from those presented.

## C.     Best Interests Test

### 1.     *Explanation*

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of

a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. As a general matter, a liquidation under Chapter 7 will not affect the rights of letter of credit beneficiaries, including certain sureties who posted bonds that the Debtor purchased for various business, litigation, and other reasons. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then the plan is not in the best interests of creditors and equity security holders.

2.    *Application of the Liquidation Analysis*

A liquidation analysis prepared with respect to the Debtor is included in the Plan Supplement (the **"Liquidation Analysis"**). The Debtor believes that any Liquidation Analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtor has projected the amount of Allowed Claims based on a review of its scheduled and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected a range for the amount of Allowed Claims with the low end of the range the lowest reasonable amount of Claims and the high end of the range the highest reasonable amount of the Claims, thus allowing

assessment of the most likely range of Chapter 7 liquidation dividends to the holders of the Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

The Liquidation Analysis includes assumed values for the Debtor's assets that may differ substantially from the assumed values used for other purposes in the Bankruptcy Case, including in connection with the obtaining of the DIP Facility. These differences are attributable primarily to the different circumstances under which the values are obtained. If the Debtor continues to operate in the ordinary course asset values may have a substantially higher value than if the Debtor ceased operating and simply liquidated its assets under Chapter 7 of the Bankruptcy Code. The Debtor and Sierra Vista believe that the Debtor's assets are of substantially higher value in the context of a going-concern enterprise than in a liquidation.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor and Sierra Vista believe that, taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code § 1129(a)(7). The Debtor and Sierra Vista believe that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtor and the retention of the going-concern value of the Debtor's assets under the Plan, rather than a forced liquidation of those assets, will allow the realization of more value for the Debtor's creditors, owing principally to the greatly reduced value of assets in a liquidation context and to the increased costs attending a Chapter 7 liquidation, including statutory Chapter 7 trustee fees and trustee's counsel fees, to name only a few additional expenses not present under the Plan. Indeed, the Debtor believes that holders of general unsecured Claims in Class 5 would realize little to no recovery if the Debtor's assets were liquidated under Chapter 7.

## D.    Confirmation Over the Dissent of Non-Approving Classes

If the Plan is not accepted by all impaired Classes of Allowed Claims, the Plan may still be confirmed by the Bankruptcy Court under section 1129(b) of the Bankruptcy Code if: (a) the Plan has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class (the "Cramdown Provisions"). If the Plan is not accepted by all impaired Classes of Allowed Claims or Member Interests, the Debtor reserves the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

The condition that a plan be "fair and equitable" with respect to a rejecting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan,

Case 4:13-bk-01738-BMW    Doc 30    Filed 02/20/13    Entered 02/20/13 11:56:26    Desc
                        Main Document        Page 34 of 43

at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a rejecting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of interests includes the requirements that either (a) the plan provides that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest, or (b) if the class does not receive such amount, no class of interests junior to the rejecting class will receive a distribution under the plan.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

A summary description of certain United States federal income tax consequences (hereinafter, "Tax Consequences") of the Plan follows. This description is for informational purposes only. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to the Holders of Claims other than Sierra Vista, who is one of the Co-Proponents.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Co-Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a reviewing court might adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (other than the Debtor), investors in pass-through entities, Holders that hold Claims as part of a hedge, straddle or conversion, holders who acquired their Claims as compensation, and holders who do not hold their Claims as capital assets).

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful and prudent tax planning and advice based upon the individual circumstances pertaining to the Debtor or a holder of a Claim.

Case 4:13-bk-01738-BMW    Doc 30    Filed 02/20/13    Entered 02/20/13 11:56:26    Desc
                    Main Document    Page 35 of 43

The Debtor and all holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable under the Plan.

## B. Consequences to the Debtor

The Debtor is a tax-exempt organization pursuant to section 501(c)(3) of the Code, and a public charity within the meaning of section 509(a)(1) of the Code. As such, the Debtor is organized and operated exclusively for the tax-exempt purposes described under section 501(c)(3) of the Code ("Tax-Exempt Purposes"). The Debtor, notwithstanding its petition for relief under Chapter 11, will continue to be organized and operated exclusively for Tax-Exempt purposes and we believe that it will continue to be qualified as a tax-exempt organization pursuant to section 501(c)(3) of the Internal Revenue Code through and including the Effective Date, and a public charity within the meaning of section 509(a)(1) of the Code.

A tax-exempt organization's exemption from federal income taxation is qualified rather than absolute. Specifically, an organization exempt from federal income tax under section 501(c)(3) of the Code is nevertheless taxable on its income from a trade or business that is "unrelated" to its Tax-Exempt Purposes. The Debtor incurred all of the Claims in furthering its operations, and such Debtor's operations all were in furtherance of its Tax-Exempt Purposes. Thus, with respect to the implementation of the Plan, including with respect to any cancellation of any outstanding indebtedness associated with any Claim, the Debtor does not believe that it will be liable for any such tax liability.

## C. Tax Consequences to the Creditors who Hold Debt Instruments

### 1. *Introduction*

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below, who hold debt instruments. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; and (7) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the

administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

2.  *Recognition and Character of Gain or Loss Generally*

It is not anticipated that there will be any Secured Creditors other than Sierra Vista. If there are Secured Creditors other than Sierra Vista, such Secured Creditors will be classified in Class 3 under the Plan will be paid and amount equal to such Secured Creditor's Allowed Miscellaneous Secured Claim at the time stated in the Plan. The Unsecured Creditors in Class 5 under the Plan will receive Pro Rata beneficial interests (through the Unsecured Creditors' Trust)[1] in exchange for the full and final satisfaction of their Claims. Under such circumstances, subject to the potential factors described above, a Creditor will generally recognize gain or loss in an amount equal to the difference between the Creditor's amount realized (the value of its beneficial interest in the Unsecured Creditor Fund) and the Creditor's adjusted tax basis in such Claim.

The character of a Creditors gain or loss as described in the immediately preceding paragraph as capital gain or loss or as ordinary income or loss will be determined by a number of factors which vary depending on a Creditor's particular circumstances. Such factors include the nature of such Claim as held by the Creditor, whether such Claim constitutes a capital asset in the hands of the Creditor, whether such Claim was purchased at a discount, whether any amount received in respect of such Claim constitutes accrued interest, and whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to such Claim. A Creditor who recognizes a loss on a transaction conducted under the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.

3.  *Accrued Interest*

A Creditor who has not previously included accrued interest into taxable income will be required to recognize ordinary income equal to the portion of the: (i) a cash payment; (ii) the face amount of any debt instrument given the Creditor; or (iii) the beneficial interest such Creditor has in the Unsecured Creditor Fund, as applicable, that is allocable to the Creditor's accrued interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of its existing Claims. A Creditor who has included such accrued interest into taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating between principal and accrued interest), even if the underlying Claim is held as a capital asset. It is not clear the extent to which a portion of the: (i) a cash payment; (ii) the face amount of any debt instrument given the Creditor; or (iii) the beneficial interest such Creditor has in the issue price of the , as applicable, will be properly allocable to accrued interest.

---

[1]    While not free from doubt, we believe that the Unsecured Creditors' Trust will be treated as a grantor trust for Tax Purposes and that each Unsecured Creditor having an interest in such trust will be treated as owning an undivided interest equal to their Pro Rata beneficial interest in the Unsecured Creditor Fund vested in such trust. We encourage the Unsecured Creditors to discuss this treatment with their own tax advisors.

4. *Market Discount*

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder/Creditor in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder/Creditor if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder/Creditor's adjusted tax basis in the debt obligation immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. To the extent that a holder/Creditor has not previously included market discount in its taxable income, gain recognized by a holder/Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder/Creditor's period of ownership. A holder/Creditor of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a holder/Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the holder/Creditor's period of ownership.

5. *Other Claimholders*

If a Creditor reaches an agreement with the Debtors to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, such Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

6. *3.8% Medicare Tax*

Effective for 2013, pursuant to the Patient Protection and Affordable Care Act, certain passive taxpayers and trusts who meet certain income thresholds (generally, $250,000 of adjusted gross income in the case of individuals) will be subject to an additional 3.8% tax on certain kinds of investment income. The Creditors (and their direct and indirect owners) all may be subject to this additional tax. We encourage each of you to consult your own tax advisors with respect to this additional tax.

**D.    Information Reporting and Backup Withholding**

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable payments are subject to backup withholding under certain circumstances. A United States holder may be subject to backup withholding at rate of 28 percent with respect to certain distributions or payments of accrued interest, market discount, or similar items pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the

holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding.

Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

## E.      Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A LIMITED SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF THE DEBTOR, ANY HOLDER OF A MEMBER INTEREST (IF ANY) AND THE CREDITORS. ACCORDINGLY, ANYONE AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

### IRS Circular 230 Notice:

TO COMPLY WITH UNITED STATES TREASURY REGULATIONS, BE ADVISED THAT ANY UNITED STATES FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (AND ANY SUCH ADVICE GIVEN IN THIS DISCLOSURE STATEMENT) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY UNITED STATES FEDERAL TAX PENALTIES OR TO PROMOTE, MARKET, OR RECOMMEND TO ANOTHER PARTY ANY TRANSACTION OR MATTER DESCRIBED HEREIN.

## X.      RISK FACTORS

## A.      Generally

The restructuring of the Debtor involves a degree of risk, and this Disclosure Statement, the Plan Supplement, and certain of their Exhibits contain forward-looking statements that involve risks and uncertainty. The Reorganized Debtor's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims and Member Interests should consider carefully the following factors in addition to the other information contained in this Disclosure Statement.**

**B.    Dependence on Key Personnel**

The Reorganized Debtor's post-Effective Date operations depend to a great extent on the efforts of its officers and other key personnel. There can be no assurance that the Reorganized Debtor will be successful in attracting and retaining such personnel, or that it will not incur increased costs in order to do so. The Reorganized Debtor's failure to attract additional qualified employees or to retain the services of key personnel could have a material adverse effect on the Reorganized Debtor's business, financial condition, and results of operations.

**C.    Claim Amount Estimates**

The Actual Amount of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery of Claims. The estimated Claims set forth in the Disclosure Statement and Plan Supplement are based on various assumptions, and the actual amount of Allowed Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**D.    Reorganization Factors**

1.    *Financial Considerations*

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Member Interests should be aware of some of the principal risks associated with the contemplated reorganization:

a.    There is a risk that one of more of the required conditions or obligations under the Plan will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

b.    The total amount of all Claims filed in the Chapter 11 Case may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan and in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. The amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim or Allowed Member Interest in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

c.   Uncertainties may adversely affect the Reorganized Debtor's future operations including acts of God or similar circumstances. Many of these factors will be substantially beyond the Reorganized Debtor's control, and a change in any factor or combination of factors could have a material adverse effect on the Reorganized Debtor's financial condition, cash flows, and results of operations.

2.   *Risk of Non-Confirmation of the Plan*

Although the Debtor and Sierra Vista believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Member Interests, or that such modifications would not necessitate solicitation or re-solicitation of votes.

## XI.   ALTERNATIVES TO THE PLAN

The Debtor and Sierra Vista believe that the Plan affords holders of Claims and Member Interests the greatest realization on the Debtor's assets and, therefore, is in the best interests of those holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case but without any immediately available financing; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

## A.   Continuation of the Chapter 11 Cases

Because the Debtor's operations are not likely to change materially, continuing the Chapter 11 Case would only increase the amount of Administrative Claims against the Estate without any corresponding financing seemingly available. Since the Plan provides a means of satisfying all Claims with a blend of Cash, new member interest, and beneficial interests in the Unsecured Creditor Trust, continuing the Chapter 11 Case would serve no purpose other than increasing costs to the Estate and reducing recoveries to holders of Class 5 General Unsecured Claims.

## B.   Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtor, or, after the expiration of the Debtor's exclusive period in which to propose and solicit a reorganization plan, any other party-in-interest in the Chapter 11 Case, could propose a different plan or plans. Those plans might involve either a reorganization and continuation of the Debtor's business, or some other form of orderly liquidation of the Debtor's assets, or a combination of both.

## C.   Liquidation Under Chapter 7

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtor. It is impossible to predict precisely how the proceeds of the

liquidation would be distributed to the respective holders of Claims against or Member Interests in the Debtor. The Debtor believes, however, that holders of Claims and Member Interests would lose substantial value if the Debtor were forced to liquidate under Chapter 7 because the Debtor's assets would bring a significantly reduced value in a liquidation context (as opposed to a going concern context) and additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist those trustees would cause a substantial diminution in the value of the Estate. The assets available for distribution to holders of Claims and Member Interest would be reduced by those additional expenses.

## XII.   CONCLUSION

### A.   Hearing on and Objections to Confirmation

    1.   *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for [_____], 2013 at ____ a.m. (Arizona time). The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtor under Bankruptcy Code § 1127 before, during, or as a result of that hearing, without further notice to parties in interest.

    2.   *Deadline for Objections to Confirmation*

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for [_____], 2013 at 5:00 p.m. (Arizona time).

Case 4:13-bk-01738-BMW    Doc 30    Filed 02/20/13    Entered 02/20/13 11:56:26    Desc
Main Document    Page 42 of 43

## B.     Recommendation

The Plan provides for an equitable distribution to Creditors and the continuation of the Debtor's business for the benefit of the Debtor's customers, suppliers, and employees. The Debtor and Sierra Vista believe that any alternative to confirmation of the Plan, such as Chapter 7 liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation, and costs. For these reasons, the Debtor and Sierra Vista urge you to vote to accept the Plan and to support Confirmation of the Plan.

Dated: February 20, 2013                                  Respectfully submitted,


**COMMUNITY HEALTHCARE OF DOUGLAS, INC., Debtor-In-Possession**

By:     /s/ *Anita Benson*
        NAME:  Anita Benson
        TITLE:  C.E.C.

**LAW OFFICES OF MICHAEL W. CARMEL, LTD.**

By:     /s/ *Michael W. Carmel*
        Michael W. Carmel
        80 E. Columbus Ave.
        Phoenix, AZ 85012
        Counsel for Debtor-In-Possession