ILENE J. LASHINSKY (#003073)
United States Trustee
District of Arizona

LARRY L. WATSON (CA BAR NO. 193531)
Trial Attorney
230 N. First Ave., Suite 204
Phoenix, Arizona 85003-1706
Phone: (602) 682-2607
FAX:   (602) 514-7270

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>COMMUNITY HEALTHCARE OF DOUGLAS, INC,<br><br>Debtor. | In Proceedings under Chapter 11<br><br>Case No. 4:13-bk-01738-BMW<br><br>**UNITED STATES TRUSTEE'S MOTION FOR APPOINTMENT OF PATIENT CARE OMBUDSMAN** |

The United States Trustee for the District of Arizona (the "U.S. Trustee"), by and through counsel undersigned, hereby moves the Court pursuant to 11 U.S.C. § 333(a) for the appointment of a patient care ombudsman. This motion is supported by the below Memorandum of Points and Authorities.

**Memorandum of Points and Authorities**

Section 333(a)(1) of the Bankruptcy Code provides that if a debtor in a case under chapter 7, 9 or 11 is a "health care business", the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business, unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

The appointment of an ombudsman is determined by the results of a two part test. First the Court must decide if the above captioned debtor ("Debtor") is a healthcare business as defined in 11 U.S.C. § 101(27A). Second, if the Court finds the Debtor to be a healthcare

business it must appoint an ombudsman unless it finds "such ombudsman is not necessary for the protection of patients under the specific facts of the case." 11 U.S.C. § 333(a)(1).

### 1. Is the Hospital a Qualifying Healthcare Business?

A leading case on § 101(27A) is *In re Medical Assc. of Pinellas, LLC,* 360 B.R. 356 (Bankr.M.D.Fla.2007). In *Pinellas* the court distilled § 101(27A) into a four part test: (1) the debtor must be a private or public entity; (2) the debtor must be primarily engaged in offering to the general public facilities and services; (3) the facilities and services must be for the diagnosis or treatment of injury, deformity or disease; and (4) the facilities must be for surgical care, drug treatment, psychiatric care or obstetric care. *See id.* at 359.

The question as to whether the Debtor is a healthcare business as defined under 11 U.S.C. § 101(27A) is undisputed. The Debtor operates a fully functioning hospital providing emergency, surgical and overnight care to patients. The Debtor's staff consists of practicing physicians who perform medical diagnosis, prescribe treatment and oversee the administration of the skilled nursing staff who monitor and perform invasive procedures at the direction of the physicians.

### 2. Is an Ombudsman Necessary to Protect the Hospital's Patients?

In evaluating whether appointment of a patient care ombudsman is necessary for the protection of patients under the specific facts of a case, the bankruptcy court analyzes the following non-exclusive list of nine salient factors: (1) cause of debtor's bankruptcy, (2) presence and role of licensing or supervising entities, (3) debtor's past history of patient care, (4) ability of patients to protect their rights, (5) level of dependency of patients on the facility, (6) likelihood of tension between interests of patients and debtor, (7) potential injury to patients if debtor drastically reduced its level of patient care, (8) presence and sufficiency of internal safeguards to ensure appropriate level of care, and (9) impact of the cost of an ombudsman on likelihood of a successful reorganization. *See In re Valley Health System*, 381 B.R. 756 (Bankr. C.D. 2008); *see also In re Alternate Family Care*, 377 B.R. 754 (Bankr. S.D. Fla. 2001)

In applying the factors outlined by the Courts involving the application of 11 U.S.C. § 333(a)(1) the U.S Trustee provides the following:

   a. **Cause of the Bankruptcy**: The Debtor's bankruptcy has been brought about as a result of change in payments by state and federal agencies primarily related to the medical care of the elderly, persons with severe disabilities, the indigent and working poor, as well as, migrant persons. This delay and reduction in payment has led to significant cash flow issues and the necessity to borrow funds from an adjoining regional medical care provider to avoid a disruption in medical services to the Debtor's patients and community.

   b. **Presence and Role of Licensing or Supervising Entities**: Unlike the State of California, through the California Department of Public Health (''CDPH''), the State of Arizona does not have a State appointed official who provides independent oversight for the care of patients admitted to a hospital. Nor is there a county or local publicly appointed official in place to provide such oversight. The only protection in place to oversee patient concerns and rights is a "Patient Ombudsman" who is hired and serves as an employee of the Debtor.

   Based upon the information provided by the Debtor, it appears that the Debtor is properly accredited to perform the services that it renders to its patients. The U.S. Trustee is not aware that any of the accrediting agencies are actively monitoring the Debtor during the pendency of the bankruptcy proceeding, or are otherwise available to provide ongoing oversight of patient rights in the event of a disruption or transfer of services to a third party.

   c. **Debtor's Past History of Patient Care**: In review of public records and the information provided by the Debtor, it does not appear that the Debtor has had significant patient care concerns. The Debtor's level of care has been rated as "average" with no reports of significant patient care incidents dating back to 2009 by one online reporter, Healthgrades.com ("Healthgrades"). Healthgrades uses Medicare inpatient data from the Medicare Provider Analysis and Review (MedPAR) database

- 3 -

Case 4:13-bk-01738-BMW   Doc 59   Filed 03/24/13   Entered 03/24/13 20:58:23   Desc
Main Document   Page 3 of 6

and Patient Safety Indicator software from the Agency for Healthcare Research and Quality (AHRQ) to calculate event rates for 13 patient safety indicators (PSI). Specifically:

- 2012: Centers for Medicare and Medicaid Services for years 2008 through 2010. Updated 5/22/2012.
- 2011: Centers for Medicare and Medicaid Services for years 2007 through 2009. Updated 3/9/2011.
- 2010: Centers for Medicare and Medicaid Services for years 2006 through 2008. Updated 3/29/2010.

*See,* http://www.healthgrades.com/hospital-directory/arizona-az/southeast-arizona-medical-center-hgstb8c3ad13031303

d. **Ability of Patients to Protect their Rights**: The U.S. Trustee's understanding is that a large portion of the community served by the Debtor are comprised of vulnerable populations such as the elderly, indigent poor and migrant persons. These sectors of the population historically lack the financial and personal resources, as well as the sophistication, to effectively advocate for their needs and rights. There can be no reasonable expectation that the members of these populations are able to independently access either the state or federal Medicaid and Medicare agencies to protect their rights without the presence of an intervening third party such as the CDPH in California – or an independent third party ombudsman in Arizona.

e. **Level of Dependency of Patients on the Facility**: Based upon the information provided by the Debtor, the U.S. Trustee understands that the number of patients dependent on the Debtor for continuous, ongoing care is minimal. However, the U.S. Trustee believes that in reality, the Debtor's services are critical to the community and patients it serves. The Debtor's website references a program that provides "round the clock care for patients who are in transition between an acute care facility and either their home or a long term care facility. Those patients who benefit from a Swing Bed program have had recent joint replacements, are patients with strokes, cardiac patients and patients with long-term illnesses."

*See* http://www.samcdouglas.org/getpage.php?name=services&sub=Static

- 4 -

The Debtor needs to provide a better profile of the patient care that it is providing to patients on an ongoing basis and the services upon which its patients place a great deal of reliance (e.g. kidney dialysis, etc.).

f. **Likelihood of Tension between Interests of Patients and Debtor**: It appears that as a rural hospital providing the only meaningful organized healthcare in its region, the patients' interests and the Debtor's interests are closely aligned. The **University of Arizona's Center for Rural Health has identified the Debtor as a** "**Critical Access Hospital**," which, among other services, has an ER that is designated by the Arizona Department of Health Services, Bureau of EMS and Trauma Systemsas a Level IV Trauma Center allowing it to support the state's Level I Trauma Centers.
*See* http://crh.arizona.edu/programs/flex/cahs-list/southeast-az

"The physicians practicing at the hospital are a blend of family practice, podiatry, cardiology, cataract surgery, and hospitalist. The Rural Health Clinic located on the hospital campus, provides services focusing on chronic illness, adult and geriatric care, preventive medicine which includes Alzheimer, osteoporosis, cardiac care, chronic lung disease, allergy, cancer and diabetic screening." *See id.*

g. **Potential Injury to Patients if Debtor Drastically Reduced its Level of Patient Care**: *See* paragraph "f" above.

h. **Presence and Sufficiency of Internal Safeguards to Ensure Appropriate Level of Care**: The Debtor has indicated that it has a "Patient Ombudsman" that acts in the interests of the Debtor's patients. However, this person clearly is an employee of the Debtor whose independence to make decisions in the best interests of patients over the interests of the Debtor is questionable.

11 U.S.C. § 333(a)(1) requires that an Ombudsman be a "disinterested" party. The Debtor needs to "prove up" the independence of its "Patient Ombudsman" prior to the Court accepting this related party as a suitable replacement for a third party patient advocate.

i. **Impact of the Cost of an Ombudsman on Likelihood of a Successful Reorganization**: The Debtor currently has a budget for a patient advocate position in place that could be used during the bankruptcy proceedings to offset the costs of third party oversight. In addition, the Debtor has unencumbered assets that the reorganization is not dependent upon that can be used to offset the additional administrative costs incurred by the bankruptcy estate.

Further, the U.S. Trustee has been informed by Debtor's counsel that the Debtor has been able to greatly reduce the required draw downs on its debtor-in-possession financing. The Debtor's recent financial performance has buoyed its hopes of either going forward with its currently proposed sale, find an alternative purchaser, or even proceed with its own internal restructuring and reorganization. As such, the financial indicators seem to support the ability of the bankruptcy estate to incur modest costs related to the appointment of a Patient Ombudsman in this case.

Accordingly, unless this Court finds that an ombudsman is not necessary for the protection of patients under the specific facts of the case, a patient care ombudsman should be appointed. If the Court directs such an appointment, the U.S. Trustee will, subject to this Court's approval, and pursuant to 11 U.S.C. § 333(a)(2)(A), appoint a disinterested person to serve as such ombudsman.

WHEREFORE, the U.S. Trustee respectfully requests this Court to issue an Order directing the U.S. Trustee to appoint a patient care ombudsman.

RESPECTFULLY SUBMITTED this 24th day of March, 2013.

ILENE J. LASHINSKY
United States Trustee
District of Arizona


 /s/ Larry L. Watson
LARRY L. WATSON
Trial Attorney

- 6 -