ILENE J. LASHINSKY (#003073)
United States Trustee
District of Arizona

LARRY L. WATSON (CA BAR NO. 193531)
Trial Attorney
230 N. First Ave., Suite 204
Phoenix, Arizona 85003-1706
Phone: (602) 682-2607
FAX: (602) 514-7270

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>COMMUNITY HEALTHCARE OF DOUGLAS, INC.,<br><br>      Debtor. | Chapter 11<br><br>Case No. 4:13-bk-01738-BMW<br><br>**U.S. TRUSTEE'S MOTION FOR RECONSIDERATION OF**<br>*Order: (A) Approving the Sale and Assignment of Assets of the Debtor Free and Clear of All Liens, Claims, Liabilities and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts, and (C) Granting Related Relief* |

   The United States Trustee for the District of Arizona ("U.S. Trustee") hereby brings her motion for reconsideration of *Order: (A) Approving the Sale and Assignment of Assets of the Debtor Free and Clear of All Liens, Claims, Liabilities and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts, and (C) Granting Related Relief* ("Sale Order") approved by the Court on December 17, 2013. The Court's approval of the sale of the Debtor's assets ("Assets"), as detailed in the First Amendment to Asset Purchase Agreement ("Amended APA") filed with the Court on October 17, 2013, was predicated upon inaccurate information provided by the Debtor and People's Choice Hospital,

1

L.L.C. ("PCH"). Specifically, the monthly operating reports filed by the Debtor failed to fully and accurately reflect the amount of post-petition accrued liabilities of the estate. The amount of post-petition liabilities of the estate are almost double the amount of $328,000.00 relied upon by the Court. The actual amount is approximately $635,000. If the bankruptcy estate is saddled with the payment of these post-petition liabilities, it will be rendered administratively insolvent upon the closing of the sale of the hospital's assets in January.

When the Court approved the sale of the Assets on December 11, 2013, it specifically required that the bankruptcy estate not be rendered administratively insolvent. The Court cited an accrued post-petition liability amount of $328,000 from the October 2013 monthly operating as the number that the Debtor and PCH had to provide payment for, including sale related costs, to obtain the Court's approval of the sale.

On December 20, 2013, Counsel for the U.S. Trustee was able to confirm with Debtor's counsel and the Debtor's Chief Financial Officer, Denise Hurtado, for the first time that the actual amount of post-petition liabilities of the hospital's operations, including Debtor's counsel's fees and costs, are approximately $635,000.00.

The U.S. Trustee requests the Court to delay the closing of the sale of the Debtor's Assets and to compel PCH to honor its agreement with the U.S. Trustee to ensure this bankruptcy estate is not rendered administratively insolvent. The U.S. Trustee's prior agreement with the Debtor and PCH ensured that all post-petition administrative claims would be paid in the ordinary course of the hospital's operations both pre and post-closing. No post-petition administrative creditor would be prejudiced for the benefit of, or preferred over, another administrative claimant.

2

As it stands, the majority of post-petition administrative claimants will not be paid in full for the goods and services delivered to the Debtor post-petition. On the other hand, PCH as an administrative creditor stands to receive over $700,000.00 for goods and services it provided to the Debtor through its affiliate, EmpowerSystems. In light of the fact that PCH, in its capacity as the largest secured creditor of this case, has:

- controlled the timing of the sale of the Debtor's Assets;
- caused the unnecessary accrual of administrative liabilities; and
- is the direct beneficiary of the accrued administrative liabilities in this case -

the Court must require PCH to remedy this inequity prior to the Sale Order becoming final.

It is the U.S. Trustee's belief that once the Court is provided complete and accurate information, it will find a proper basis to re-structure the payment of post-petition liabilities back to what was originally agreed to by the U.S. Trustee, the Debtor and PCH. This restructuring will:

- ensure payment in full of all post-petition administrative claimants;
- provide sufficient funds to confirm a liquidating chapter 11 plan of reorganization; and
- allow for a meaningful distribution to unsecured creditors as originally intended by the Debtor at the time of filing its chapter 11 petition to initiate this bankruptcy proceeding.

On October 9, 2013, the Court held its first hearing regarding the proposed bidding procedures ("Bidding Procedures") for the sale of the Assets ("Initial Bidding Procedures Hearing"). Prior to the Initial Bidding Procedures Hearing, counsel for the U.S. Trustee had filed the *United States Trustee's Objections to Debtor's Motion to Approve Bidding* ("UST Objection"). The Court denied the proposed Bidding Procedures based upon a number of issues, including several brought forward in the UST Objection. The Court set a status hearing regarding the Bidding Procedures for October 17, 2013 ("Bid Procedures Status Hearing").

The Court's comments at the Initial Bidding Procedures Hearing established a basis for the U.S. Trustee to negotiate new terms to be included as part of the existing Asset Purchase Agreement for the payment of post-closing administrative costs of the bankruptcy estate. Prior to the Initial Bidding Procedures Hearing, PCH repeatedly opposed the U.S. Trustee's position consistently taken with the Debtor, Sierra and PCH in order withdraw her objections to the sale:

   a. PCH must pay for the post-closing administrative costs of the estate:

- Debtor's attorney's fees to draft and confirm liquidating plan;
- Payment of PCO related fees and costs;
- Payment of U.S. Trustee quarterly fees ("Quarterly Fees") <u>related to the sale of the hospital</u>;
- Payment of <u>post-closing</u> Quarterly Fees through confirmation of the chapter 11 liquidating plan and entry of a Final Decree; and
- Sufficient assets for distribution to unsecured creditors as compensation for the usurping of their state court rights and lack of protections otherwise afforded to them by structuring the sale through a chapter 11 plan of reorganization.

   b. PCH's continued payment and assumption of pre-closing administrative costs of the Debtor's operations. This was to be consistent with PCH's payments out of its cash collateral as previously entered by the Court including:

- Payment of Debtor's attorney's pre-closing fees and costs; and
- Payment of all operating costs including vendors and employee salaries and benefits.

This treatment paralleled the initial approach to the sale of the Assets by Sierra that:

1. Was subject to a Plan and Disclosure Statement providing unsecured creditors full and complete due process in the adjudication of their claims and treatment of their state court rights;
2. Provided for the payment of all administrative costs in the case, including the Debtor's attorney's fees and costs related to the prosecution of the chapter 11 plan to bring the case to a close;
3. Waived Sierra's deficiency claims against the estate; and
4. Provided for $170,000.00 to be placed into an Unsecured Creditors Trust for distribution.

4

In exchange for this treatment of creditors, the U.S. Trustee would stipulate to the revised bidding procedures ("Revised Bidding Procedures") and agree not to pursue a valuation of PCH's secured claim or seek a surcharge for payment of administrative claims. The treatment that counsel for the U.S. Trustee sought and PCH agreed to includes:

1. PCH would waive its deficiency claim against the estate;
2. PCH would continue to pay for the administrative expenses of the hospital's ongoing operations, both pre and post-closing (consistent with the Cash Collateral Orders approved by the Court);
3. The payment of the administrative expenses would include the payment of the Debtor's attorney's fees and costs from cash collateral through the date of closing;
4. Upon closing, PCH would transfer $50,000.00 to the Debtor to offset remaining costs of the estate post-closing including Quarterly Fees, PCO fees and costs, and the payment of the administrative expenses of confirming a liquidating plan of reorganization (i.e. related attorney's fees and costs and post-closing quarterly fees);
5. Certain pre-petition unencumbered parcels of real property worth approximately $200,000 to $230,000 would be set aside for the sole benefit of unsecured creditors (to be liquidated through a liquidating chapter 11 plan);
6. Payment of $10,000.00 for sale related PCO activities; and
7. Any surcharge obtained by the PCO against PCH beyond the above referenced $10,000.00 would reduce the $50,000.00 cash transfer to the Debtor due upon the closing of the sale - dollar for dollar.

The reasons for these terms are as follows:

Waiving Deficiency: By waiving its deficiency, PCH allows the remaining general unsecured creditor body to maximize their return against whatever pool of assets is left in the estate after completion of the 363 sale. This is identical to the position taken by Sierra under its prior proposed plan.

Payment of Ongoing
Costs of Operations: PCH would continue to pay for the ongoing costs of the operations of the hospital. This served to benefit PCH by maintaining the going concern value of the Assets during the bankruptcy proceedings by preventing vendors from terminating the delivery of goods and services to the Debtor. PCH would continue its payment of accrued vendor and employee liabilities post-closing. This was required by the U.S. Trustee to prevent PCH from

5

|  |  |
|---|---|
|  | shifting the risk of maintaining the going concern value of the Assets during the bankruptcy from PCH as the largest secured creditor, to the vendors who were relying on PCH for timely payments for their goods and services. The Court, U.S. Trustee and the vendors were never put on notice in this case that PCH, as the primary secured creditor and proposed purchaser, was requiring them to look to any source other than the hospital's ongoing operations for payment. |
| Payment of Debtor's Counsel: | The Debtor and the U.S. Trustee required that the payment of Debtor's counsel would come directly from PCH's cash collateral. The Debtor maintained that the pre-closing attorney's fees could not be *pari passu* with other professionals' fees and costs. The U.S. Trustee required this treatment in order to preserve the $50,000.00 post-closing cash infusion by PCH to cover the costs of prosecuting a chapter 11 liquidating plan, payment of PCO related fees and costs, and payment of Quarterly Fees. |
| $50,000.00 Cash Infusion: | At the Initial Bidding Procedures Hearing the Court confirmed with Debtor's counsel that the Debtor would be filing a chapter 11 liquidating plan upon a closing of the sale. U.S. Trustee required the $50,000.00 cash infusion to pay for Debtor's counsel's costs of drafting and prosecuting the liquidating plan, pay for the PCO's related fees and costs not otherwise agreed to be paid for out of PCH's cash collateral, and payment of Quarterly Fees. |
| R/E Set Asides: | The Debtor had 7 parcels of real property that were unencumbered pre-petition with a total value (per a broker's opinion) of $796,530.00. Pursuant to the terms of the DIP Financing Order, the estate held a 50% post-petition unencumbered interest in the parcels ($398,265). |
|  | Three of the parcels included the Dialysis Clinic and its parking lot. PCH required that three parcels be part of the transfer of assets upon a closing of the proposed sale. The remaining parcels values totaled approximately $200,000 - $230,000. Taking into account the $50,000.00 cash infusion, costs of liquidating the real estate, and the $10,000.00 carve-out for the PCO, counsel for the U.S. Trustee believed that this was a close approximation of Sierra's $170,000 Unsecured Creditors Trust contained in its prior proposed plan. |

6

> PCO Fees and Costs: The U.S. Trustee required that PCH pay $10,000.00 from its cash collateral for fees and costs associated with the PCO's oversight of the sale process. It was agreed that in the event the PCO sought and obtained any surcharge against PCH in an amount greater than $10,000.00 ("Excess Surcharge"), PCH could offset the amount of the Excess Surcharge against the $50,000.00 cash infusion, dollar for dollar.

The above terms and conditions are not a new or novel concept. The U.S. Trustee has consistently argued for, and successfully obtained, similar terms and conditions – including set asides for unsecured creditors - as part of these types of 363 sales in the District of Arizona. Counsel for such debtors and secured creditors have agreed to, and the Courts have consistently required, such treatment in the District of Arizona. *See e.g.,* Southwest Supermarkets, LLC, Case No. 2:01-bk-14805-RJH, Hi Rise Recycling Systems, Inc., 2:02-bk-06032, Western Medical, Inc., Case No. 0:06-bk-071784-RTB, Dewey Ranch Hockey, LLC , et. al. (Phoenix Coyotes), Case No. 2:09-bk-09488-RTB, Arizona Heart Institute, Ltd., 2:10-bk-24062-GBN.

The provisions contained in the Amended APA regarding these terms and conditions was not intended to be interpreted in a vacuum. Rather, the provisions were to be interpreted taking into the account the monthly cash collateral Orders entered by the Court for the ongoing payment of administrative trade creditors, employee salaries and benefits and Debtor's attorney. One need to look no further than the proposed December cash collateral Order, submitted to the Court on the same day as the Sale Hearing that included the ongoing payment of vendors, salaries and Debtor's counsel for his billings through November 15, 2013. *See* Court's Docket Entry No. 259.

The Amended APA provision was discussed in part on the record at the October 17, 2013, Bid Procedures Status Hearing. Counsel for the U.S. Trustee stated on the record the

7

treatment for the PCO, a possible surcharge, its impact on the $50,000.00 cash infusion, and the preclusion of Mr. Carmel for seeking the payment of his pre-closing fees and costs from the infusion. Neither Mr. Carmel nor Mr. Israel objected to the counsel for the U.S. Trustee's statements.

Watson: [p]rimarily the issue comes to this, the APA has been revised. There has been an amendment to the APA to include . . . an agreed carve out, at least to a certain amount, . . . as agreed to by my office, . . . for the PCO to be able to do a review of the sale and other duties.

If there is an amount that exceeds that agreed carve out of $10,000 [for the PCO], the Debtor [and PCH] has provided an amount in the APA of $50,000 dollars in cash to the estate . . . out of cash collateral. That money is available as well for the PCO, or other administrative claimants . . . <u>other than Mr. Carmel</u>.

*See* Docket Entry No. 260, Court's audio file of Bidding Procedures Status Hearing beginning at minute 19:00.

The Court did not have the opportunity to review the Amended APA that was filed on the same day as the Bidding Procedures Status Hearing, thus it was not discussed in detail. Counsel for the U.S. Trustee did briefly explain to the Court the agreed provision to put into context PCH's $1,000,000.00 bid amount. Counsel for the U.S. Trustee was clear that without the agreement, the U.S. Trustee's objections would not have been resolved.

Watson: [t]here would be a $50,000 dollar cash set aside. And there will be a set aside of the property that is unsecured. The amount from a brokers opinion that I asked the Debtor to obtain for me equals the value of about $209,000 dollars. So they are leaving on the table about 259,000 dollars, in addition, to that $10,000 dollar carve out.

That's pretty much what has been resolved and allowed us to move ahead on the bidding procedures . . . [h]opefully have an actual order available for you shortly after the hearing, Your Honor.

*See id.* at minute 21:50.

Counsel for the U.S. Trustee has never waivered from his position regarding the requirements to have PCH pay for the administrative costs of this bankruptcy estate, have a cash

8

infusion to pay for the implementation of a liquidating plan, and a set aside for unsecured creditors. Without these three items, there simply was no benefit to any other creditor in the case. PCH would simply be using the bankruptcy process for the sole purpose of scrubbing the assets it would purchase from any liability.

As the Debtor's largest secured creditor, PCH could have simply moved to dismiss the case and sought to take over control of the hospital outside of bankruptcy. There is no equitable interest to protect – and the hospital's operations could have continued without disruption. PCH did not move to do this because they wanted the benefits of the bankruptcy process. They wanted to shield themselves from the state court rights of the creditor body, including the right to seek judgments and collection on the monies owed to the creditor body.

PCH has threatened throughout this case that it can simply seek relief from stay, close the hospital and liquidate its assets. As noted above, no one argues that point. The reality is PCH is not going to do that – at least not within the context of this bankruptcy proceeding. This is because PCH is wearing three hats:

- one as the Debtor's largest secured creditor;
- one as the proposed purchaser; and
- one as a post-petition vendor.

PCH owns EmpowerSystems. EmpowerSystems entered into a contract with the Debtor in July 2013 to integrate its patient records systems into the Debtor's already existing system. PCH has taken the assignment for payment from Empower. The cost for Empower/PCH to implement its system was nominal – it was their system. However, the reward is great.

PCH has delivered an invoice to the Debtor in the amount of $701,000.00 for implementation of the EmpowerSystems medical records system. The Debtor has submitted its application to the federal government for the related meaningful use – which funds have been

9

assigned to PCH. As a post-petition vendor, PCH stands to obtain a $701,000.00 payment. This is more than the entire amount of post-petition accrued liabilities outstanding in this case.

However, the request for the $701,000.00 in meaningful use funds can only be realized if the hospital is operating and is the one that applies for the funds. This will dissipate completely upon a closure of the hospital's operations.[1]

As it currently stands, within the context of the bankruptcy proceeding and under the current sale Order, PCH will be allowed to walk away from this bankruptcy (without infusing any cash into the bankruptcy estate), with a minimum of:

1. $700,000 in meaningful use funds;
2. Over $240,000.00 in receivables due from U.S. Immigration and Customs Enforcement; and
3. The Dialysis Clinic and parking lot valued at approximately $600,000.00;

If the U.S. Trustee is correct and PCH paid approximately $800,000.00 for Sierra' $1.8 million dollar note – PCH at a minimum stands to book at least $700,000.00 in profit from this bankruptcy proceeding.

Of course PCH will realize this benefit on the backs of the vendors and professionals in this case:

1. $573,000.00 in unpaid post-petition trade debt from which PCH received a direct benefit; and
2. $100,000.00 in professional's fees from which PCH received a direct benefit.

The Debtor, U.S. Trustee and Sierra each urged PCH since July to either tee up a 363 sale or adopt the Sierra plan to get this case out of bankruptcy. PCH chose to drag its feet, forcing the estate to accrue this large amount of post-petition liabilities, and placing the vendors in reliance

---

[1] The U.S. Trustee is investigating whether PCH can take assignment to any claim of the Debtor for meaningful use moneys. Upon a close of the sale of its Assets, the Debtor ceases to exist as a functioning hospital and may no longer qualify to apply for such funds. Pursuant to the Empower Agreements this adds no additional post-petition liability to the bankruptcy estate.

10

upon PCH for payment. Based upon PCH's actions of inducing these vendors to provide the Debtor goods and services for 5 months, thereby allowing PCH to realize the above enumerated benefits from this case, the Court must require PCH to pay these vendors in due course upon a closing of the sale of the Assets.

Counsel for the U.S Trustee has never experienced a securedd creditor in this context conduct itself in this manner. Even in cases in which the secured creditor was requiring the sale of the Debtor's assets to a third party, the secured creditor paid the freight of the administrative costs of the estate – because it received a direct benefit from those administrative claimants. And in cases in which the secured creditor is also the proposed purchaser – there is no hesitation to ensure that the administrative costs of the estate are paid for and a distribution is made to unsecured creditors – if nothing else to ensure that any argument for successor liability is cut off.

In this instance, given the significant benefit that PCH is receiving from this bankruptcy proceeding in its combined capacity as the secured creditor, proposed purchaser and administrative creditor, the Court must place the responsibility of paying the post-petition accrued liabilities back onto PCH where it belongs. This is the only way in which this case will be placed in a proper administrative posture and the sale can be closed accordingly.

Therefore, the U.S. Trustee requests that the closing of such sale be delayed pending resolution of administrative insolvency of the bankruptcy estate. The U.S. Trustee further requests that the Sale Order be amended to reflect PCH's responsibility for payment of the pre-closing accrued post-petition liabilities of the Debtor.

*Respectfully submitted* this 23rd day of December, 2013.

                      **UNITED STATES TRUSTEE**
                      District of Arizona
                      Ilene J. Lashinsky, Esq.

                      /s/ Larry L. Watson
                      Larry L. Watson
                      Trial Attorney